UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| GAMON PLUS, INC., et al., | |
| Plaintiffs, | No. 15 CV 8940 |
| v. | Judge Georgia N. Alexakis |
| THE CAMPBELL'S COMPANY F/K/A CAMPBELL SOUP COMPANY, et al., | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Gamon Plus, Inc. and Gamon International, Inc. ("Gamon") sues The Campbell's Co. ("Campbell"), The Kroger Co. ("Kroger"), Meijer, Inc. ("Meijer"), and Trinity Manufacturing, LLC ("Trinity") (collectively, "defendants"), alleging direct and indirect infringement of two patents it owns: United States Utility Patent Nos. 8,827,111 ("the '111 patent") and 9,144,326 ("the '326 patent"). [275]. Specifically, Gamon alleges that Campbell directly infringed the patents by using the "IQ Maximizer" gravity-feed racks ("racks") to display and sell its soup cans at grocery stores throughout the nation. Gamon also alleges that Campbell and Trinity are liable for indirectly infringing the patents by inducing, and contributing to, their infringement. Defendants counter that the patents are invalid and not infringed. [290], [291], [292], [293].

For the reasons explained below, the Court grants Gamon's motion for summary judgment of infringement as to direct infringement by defendants Campbell, Kroger, and Meijer. [448], [450]. It denies defendants' motion for partial

summary judgment of non-infringement [438] and denies Gamon's motion for partial summary judgment regarding prior art and patent invalidity [443], [445].

## I. Background

### A. Legal Standards

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001).

### B. Relevant Facts and Procedural History

This litigation concerns gravity-feed racks that display cans in grocery stores. Campbell first began buying display racks from Gamon in 2002. [498] ¶ 58. Campbell referred to these racks as "IQ Maximizers" or "Maximizers." *Id.* Three categories of racks are pertinent: Group A racks (condensed soup can dispensers); Group B racks (ready-to-serve soup can dispensers); and Group C racks (soup-at-hand dispensers). [450] at 1.

In 2006, Campbell issued a Request for Proposal for new racks. [500] ¶ 59. In 2008, Campbell began buying racks from Trinity, one of Gamon's competitors. *Id.*

¶ 60. Since entering this agreement with Trinity, Campbell has arranged for Trinity to ship these racks to certain retailers (including Kroger and Meijer) and has assisted retailers in installing and maintaining the racks. [482] at 14; [499] at 5–6; [500] ¶ 67.

The U.S. Patent Office issued the '111 patent on September 9, 2014, and the '326 patent on September 29, 2015. [275] ¶¶ 8, 9. Both patents are titled "Multi-Chute Gravity Feed Dispenser Display." *Id.*; [500] ¶ 56. Gamon filed this infringement action on October 8, 2015. [1]. It twice amended its complaint. [275]. Defendants filed counterclaims of patent invalidity and non-infringement. [290], [291], [292], [293]. Following a *Markman* hearing, the court previously assigned to this matter issued its Claim Construction Order. [350], [372].

At this juncture, there are three pending motions for summary judgment or partial summary judgment. Gamon seeks summary judgment on the issue of infringement, alleging that Campbell, Kroger, and Meijer infringed Claim 17 of the '111 patent and Claim 1 of the '326 patent. [450]. Defendants move for partial summary judgment on the issue of non-infringement. [496]. Gamon also seeks partial summary judgment that another retail-store display mechanism, the Eveready Dispenser, is not prior art relative to its patents and that its patents are not invalid in light of the Eveready Dispenser. [445].

Other than various scattered and oblique references in its briefs, Gamon does a poor job of specifying in its motion for summary judgment whether it is seeking judgment as a matter of law on a theory of direct or indirect infringement. *See generally* [450]. Yet, defendants have moved for summary judgment as well, seeking

3

judgment as a matter of a law in their favor on both theories of liability. *See generally* [496]. As a result, the Court will analyze the arguments advanced and evidence presented as to both direct infringement and indirect infringement, before addressing Gamon's motion regarding prior art and patent invalidity.

## II. Infringement of the '111 and '326 Patents

### A. Campbell's Direct Infringement of the Group A and B Racks

#### 1. Campbell Has Forfeited Its Sole Argument Regarding Non-Infringement of the Group A and B Racks.

Gamon argues that this Court must enter judgment in its favor with respect to Campbell's, Kroger's, and Meijer's direct infringement of the Group A and B racks because none of these defendants—a group that, in this section of its opinion and unless otherwise noted, the Court will refer to as "Campbell"[1]—offered any non-infringement contentions regarding those products before summary-judgment proceedings. [450] at 4–6. In response, Campbell argues that this District's Local Patent Rules ("LPR") only require defendants to submit non-infringement contentions that are directly responsive to a plaintiff's infringement contentions, but do not require that those responses be exhaustive. [493] at 6. As a result, Campbell

---

[1] Gamon has shifted positions in its briefs as to which defendants it seeks to hold liable for direct infringement. Ultimately, however, Gamon does not accuse Trinity of direct infringement, *see* [476] at 9–10, but continues to maintain that Campbell, Kroger, and Meijer directly infringed its patents. *See* [450] at 4 n.4; [453]; [490] at 1 n.2. As stated above, for ease of reading, and unless otherwise noted, the Court will refer to these three defendants as "Campbell" in this portion of the opinion addressing direct infringement. The Court notes, however, that the argument it discusses herein—regarding the need for the soup cans to be loaded onto the racks before direct infringement can occur—cannot be equally meritorious as to Campbell, Kroger, and Meijer. Meijer and Kroger concede that they loaded soup cans into the racks. *E.g.*, [481] at 4. So if this argument is to succeed, it can only succeed as to Campbell.

maintains, it is permitted to oppose Gamon's direct-infringement motion on new grounds: that "no reasonable jury could find direct infringement by Campbell" because Campbell does not make, use, sell, or provide the "Accused Racks *with 'generally cylindrical products' therein*, as required by all asserted claims." [496] at 6 (emphasis added); *see also* [481] at 4. In other words, for the first time in this litigation, Campbell argues that because it does not physically load the display racks with soup cans, it cannot be held liable for infringing on the patents, which requires the racks be loaded with cans. The Court agrees with Gamon that this argument has been forfeited.

First, taking stock of the procedural rules: Patent litigants in this District are required to comply with the LPRs. *See* LPR 1.1. The purpose of the LPRs "is to require parties to crystallize their theories of the case early in the litigation so as to prevent the shifting sands approach to claim construction." *Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1035 (Fed. Cir. 2015) (internal quotation marks omitted). Courts enjoy "broad discretion to manage discovery matters and enforce the Local Patent Rules." *Oil-Dri Corp. of Am. v. Nestle Purina PetCare Co.*, Case No. 15 CV 1067, 2018 WL 3130943, at *4 (N.D. Ill. June 26, 2018).

Under the LPRs, the parties exchange information called "infringement contentions" designed to put each other on notice as to their theories of infringement and non-infringement. The infringement and non-infringement contentions act as a sort of conversation between the parties. LPR 2.2 requires a plaintiff to serve the defendant with its initial infringement contentions, which identify the patent claims

that the plaintiff believes are infringed. *Oil-Dri Corp. of Am. v. Nestle Purina PetCare Co.*, Case No. 15 CV 1067, 2017 WL 1862646, at *2 (N.D. Ill. May 9, 2017). LPR 2.3, in turn, requires the defendant to serve the plaintiff with its initial contentions "explaining the basis for *any* claims of non-infringement, unenforceability, and invalidity." Judge Matthew F. Kennelly, Edward D. Manzo, *Northern District of Illinois Adopts Local Patent Rules*, 9 J. Marshall Rev. Intell. Prop. L. 202, 212 (2010) (emphasis added). More specifically, for non-infringement contentions, LPR 2.3(a) requires the defendant to prepare "a chart, responsive to [plaintiff's infringement chart], that separately indicates, for each identified element in each asserted claim … whether such element is present … in each Accused Instrumentality and, if not, *each reason* for such denial and the relevant distinctions." (Emphasis added.)

These contentions are then finalized under LPR 3.1 and 3.2, which require service of the plaintiff's final infringement contentions and the defendant's response to those final contentions. *See Morningware, Inc. v. Hearthware Home Prod., Inc.*, Case No. 09 CV 4348, 2010 WL 3781254, at *2 (N.D. Ill. Sept. 22, 2010); Kennelly, *supra*, at 216. The finalized contentions must be sufficiently detailed and non-conclusory. *See Morningware*, Case No. 09 CV 4348, 2010 WL 3781254, at *2–7. And they must be comprehensive: The rules "requir[e] a party to lay *all* its infringement or invalidity cards on the table in its Final Contentions." *Medline Indus., Inc. v. C.R. Bard, Inc.*, 511 F. Supp. 3d 883, 890 (N.D. Ill. 2021) (emphasis added).

Critically, courts in this District have barred defendants from raising during summary-judgment proceedings arguments supporting non-infringement where

6

those arguments were not included in their final non-infringement contentions. *See, e.g., Medline Indus., Inc. v. C.R. Bard, Inc.*, Case No. 16 CV 3529, 2024 WL 1376464, at *7–8 (N.D. Ill. Mar. 31, 2024) ("Bard may not rely on a non-infringement theory that it did not disclose in its final non-infringement contentions in order to seek summary judgment of non-infringement."); *Sloan Valve Co. v. Zurn Indus., Inc.,* Case No. 10 CV 204, 2013 WL 6132598, at *11–12 (N.D. Ill. Nov. 20, 2013) (explaining that defendant's non-infringement theory was untimely where the theory was "never disclosed … in its final contentions," plaintiff did not otherwise "have notice of this non-infringement argument," and defendant "failed to seek leave to amend its final non-infringement contentions to include this theory").

Like the defendants in *Medline* and *Sloan Valve,* Campbell never sought leave to amend its final non-infringement contentions to include the theory of non-infringement that it now asserts. Still, Campbell insists that it has not run afoul of the LPRs because LPR 2.3 only requires a defendant to provide a chart "responsive to [plaintiff's] chart." Campbell claims that this language means that a defendant is required to respond narrowly, but not exhaustively, to a plaintiff's infringement contentions. [481] at 4. As a result, according to Campbell, because Gamon never identified in its infringement contentions *which* defendant loaded the cans into the racks, the defendants were not required to argue in their non-infringement contentions that Campbell (the individual defendant) was not the defendant that did so. *Id*.

The Court disagrees with Campbell's interpretation of the LPRs. Under that interpretation, a defendant could shift its theories of non-infringement late in the game, depriving a plaintiff of the opportunity to conduct pertinent discovery. This tactic runs afoul of the LPRs' interest in early disclosure. *See Keranos*, 797 F.3d at 1035 (the LPRs are designed to "require parties to crystallize their theories of the case early in the litigation").

Nor is the Court persuaded by Campbell's reliance on two out-of-district cases, neither of which interprets this District's LPRs. [481] at 4–5. In one of those two cases, the district court expressly concluded that the plaintiff was not prejudiced by the defendant's belated disclosure—a position that Campbell does not stake out here. *See Supernus Pharm., Inc. v. Torrent Pharm. Ltd.,* Case No. 21-06964, 2024 WL 1208663, at *11 (D. N.J. Jan. 30, 2024) (expert testimony that defendant elicited during cross-examination at trial and which defendant "did not identify in its noninfringement contentions" was admissible, where the testimony was "relatively brief" and "there was little prejudice or surprise to Supernus that its expert's opinions must sustain scrutiny"). And the second case actually supports the Court's conclusion, striking expert testimony that would have belatedly shored up a party's deficient contentions. *See Polaris PowerLED Tech., LLC v. Vizio, Inc.,* Case No. SACV 18-1571, 2020 WL 4258663, at *4 (C.D. Cal. May 14, 2020) (where plaintiff "inadequately disclosed" its infringement contentions, the court granted defendant's motion to strike opinions from plaintiff's expert describing those infringement theories).

Campbell's reading of the LPRs is also somewhat befuddling in light of what arguments it *did* advance in its non-infringement contentions. In its final infringement contentions, Gamon alleged that the rack "has been observed storing and displaying Campbell's brand, Meijer brand, and Kroger brand soup cans." *See, e.g.*, [447-10] at 15. It also alleged that "Campbell and Trinity manufacture, use, sell, offer to sell, install, supply, import and/or maintain the accused dispenser and display rack systems with Campbell's brand of soups." *Id.* at 7. In response to these contentions, Campbell contested whether one type of can was truly cylindrical within the claim's meaning. [453-10] at 1, 8, 13. Given the granular nature of this argument, the Court is hard-pressed to believe that Campbell understood the LPRs to require its disclosure, but not the disclosure of a more overarching position—namely, that regardless of whether the soup cans were truly cylindrical, Campbell (the individual defendant) could not be liable for direct infringement if it didn't load the cans onto the racks. And the Court's impression is fortified by Gamon's references to the loaded nature of the racks in its contentions. Put another way: Even if this Court were to read the LPRs as Campbell urges, Campbell still should have raised its non-infringement argument in response to Gamon's final infringement contentions.

Gamon has provided substantial evidence of infringement as to the Group A and B racks. *See generally* [450] at 4–6. Setting aside its forfeited non-infringement argument, Campbell does not otherwise rebut Gamon's evidence. [482] at 8–9 ("Defendants do not dispute that accused racks loaded with condensed or RTS cans meet the limitations of the Asserted Claims."). Where a plaintiff provides substantial

evidence of infringement, and a defendant does not rebut that evidence, the Court must grant the plaintiff's motion for summary judgment of infringement. *See Robertson Transformer Co. v. Gen. Elec. Co.,* 149 F. Supp. 3d 919, 933–34 (N.D. Ill. 2015) (granting summary judgment of infringement where defendant did not dispute plaintiff's expert's opinion of infringement); *Medline Indus.,* Case No. 16 CV 3529, 2024 WL 1376464, at *8 (where a defendant relied exclusively on a non-infringement contention it did not disclose in its final non-infringement contentions, "[o]n this ground alone" the plaintiff's motion for summary judgment of infringement was granted and the defendant's motion for summary judgment of non-infringement was denied).

This Court follows suit, granting Gamon's motion for summary judgment of direct infringement by Campbell, Kroger, and Meijer of Claim 1 of the '326 patent and Claim 17 of the '111 patent.

### 2. Even on Its Merits, Campbell's Non-Infringement Argument as to the Group A and B Racks Fails.

Even on its merits, Campbell's non-infringement argument as to the Group A and B racks still fails.

To be liable for direct infringement, a defendant must "make, use, offer to sell, or sell" a patented invention. 35 U.S.C. § 271(a). Gamon does not dispute that Trinity is the entity that manufactures the racks and sells them to Campbell (the individual defendant), *see, e.g.*, [500] ¶¶ 32, 60, and Gamon's briefs do not mount an argument that Campbell "offer[s] to sell" the racks within the meaning of § 271(a). That leaves Gamon's arguments regarding "use." *E.g.*, [476] at 6–9. Section 271(a) forbids the use

of a patented invention, even without its manufacture or sale. *See Roche Prods., Inc. v. Bolar Pharm. Co.,* 733 F.2d 858, 861 (Fed. Cir. 1983). But Congress has never defined "use," so its meaning is a matter of judicial interpretation. *Id.*

Per the Federal Circuit, to "use" an invention within the meaning of § 271(a), a defendant "must put the invention into service," i.e., control it as a whole and benefit from it. *See Centillion Data Sys., LLC v. Qwest Communs. Intl's,* 631 F.3d 1279, 1284 (Fed. Cir. 2011). It does not matter whether the defendant has "physical or direct control over each individual element" of the invention. *Id.* Rather, to "use" the product, the defendant must simply cause the product to work for its patented purpose. *Id.* Receiving, storing, or shipping alone—"mere possession," in other words—does not constitute "use" under § 271(a). *Quantum Group Inc. v. Am. Sensor Inc.,* Case No. 96 CV 0761, 1998 WL 766707, at *6 (N.D. Ill. Apr. 10, 1998). But functional use of the infringing product does. *Id.* For example, operating a patented product at a sales demonstration or during product testing could constitute "use" and therefore qualify as direct infringement. *See id.* at *7; *Lubrizol Specialty Prods., Inc. v. Flowchem LLC,* 165 F. Supp. 3d 534, 539 (S.D. Tex. 2016). Here, where Campbell (the individual defendant) has conceded that it bought the racks from Trinity so that it "can merchandize [its] soup products," arranged for Trinity to ship the racks to Kroger and Meijer for that purpose, and assisted those retailers in installing and maintaining the racks, Campbell, Meijer, and Kroger all "used" the racks within the meaning of § 271(a). [498] ¶ 60; [481] at 6; [482] at 14, 19 ¶ 10; [499] at 5–6.

11

Nevertheless, Campbell argues that it could not have infringed the racks' patents because "the Accused Racks were never made, sold, shipped, or delivered to retailers with soup or other 'cylindrical products' in the racks." [496] at 11. True though that may be, Campbell does not argue that loading the infringing racks with soup constituted an abuse, modification, or alternation contrary to the intended design of the racks. *See Baxter Int'l, Inc. v. Becton, Dickinson & Co.*, 622 F. Supp. 3d 725, 741 (N.D. Ill. 2022) ("[E]vidence of infringement based on abuse, modification, or some type of alteration that is contrary to the intended design of the accused device cannot support infringement."). Nor could it: The racks were intended to be loaded with cans of its soup. *See* [477-18]; [477-34] at 3, 5, 7 (Campbell's marketing material, modeling loaded racks).

For this reason, the Court is not persuaded that the two cases upon which Campbell relies in its non-infringement motion call for a different result. Neither case fits the facts of the dispute here. In *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,* the Federal Circuit considered a patented surgical anchoring system that required contact with bone. 424 F.3d 1293 (Fed. Cir. 2005). The manufacturer of the allegedly infringing device argued that it could not have directly infringed that patent because its device was not intended to contact bone. *Id.* at 1310. In fact, the manufacturer expressly instructed surgeons *not* to put its device in contact with bone. *Id*. The appeals court credited this argument, holding that because the manufacturer did not make a device that was intended to contact bone, the manufacturer did not directly infringe on a patent for a product that required contact with bone. *Id*. at 1311.

12

If anything, it was the surgeons—who independently decided to screw the device into bone, contrary to the manufacturer's written instructions—who may have infringed. *Id.* Here, Campbell does not argue that its customer-retailers acted contrary to its instructions or expectations by loading soup cans into the racks. Indeed, as already noted, Campbell cannot make this argument in light of its own marketing materials. *Cross Medical* therefore does not apply.

*Centillion* is similarly inapplicable. 631 F.3d at 1279. In *Centillion*, the named defendant only provided the underlying, allegedly infringing software; it did not "combine all of the claim elements." *Id.* at 1282, 1288. The defendant's customers instead played that role, "complet[ing] the system by providing the personal computer data processing means and installing the client software." *Id.* at 1288 (internal quotation marks omitted). As a result, the customers—but not the defendant software provider—were responsible for "making" the infringing product within the meaning of § 271(a). *Id.* For similar reasons, the defendant software provider also was not responsible for direct infringement via the statute's prohibition on "use." *Id.* at 1286–87. *Centillion* explained that "to 'use' the system, [the defendant] must put the claimed invention into service, *i.e.*, control the system and obtain benefit from it." *Id.* at 1286. But unlike its customers, the defendant only "ma[de] the back-end processing elements"; it never actually put the entire system into service because it never provided the requisite personal computer data processing means. *Id.* The defendant therefore did not "use" the claimed system within the meaning of § 271(a). *Id.*

Here, Campbell provides all the components—both the racks and the soup cans—necessary to infringe upon each element of the claim. And as Gamon points out, the court previously assigned to this matter already rejected Campbell's attempt to read a "loading" step into the claims. *See* [490] at 4–5. At the claim-construction phase, in the context of arguing that the asserted claims were impermissible mixed apparatus/method claims, Campbell claimed that a "display rack does not fall within the scope of these claims unless and until a user removes a product from the rack and/or returns it to the rack as recited." [372] at 21. In its Claim Construction Order, the previous court explained that the asserted claims "recite a display rack structure that allows for certain functionality, and the claim would be infringed if the structure were designed as specified *to allow for such functionality*," but "no method is claimed or required." [372] at 20 (emphasis added); *see also id.* at 23 (explaining that any verbiage in the claims discussing the loading of cans "represent[ed] permissible functional language used to describe the *capabilities* of the claimed display rack") (emphasis added). In other words, the actual act of loading is immaterial to the patented claim, further distinguishing this case from *Centillion* and *Cross Medical*.

As other Courts have pointed out, there is a common proposition between *Centillion* and *Cross Medical*: If an allegedly infringing product requires an individual (say, a customer) to put together multiple components from multiple sources (say, manufacturers or suppliers) to build a product that infringes on a claim, then the manufacturers or suppliers do not directly infringe. But the customer who actually built the infringing product might. *See On Track Innovations Ltd. v. T-*

*Mobile USA, Inc.*, 106 F. Supp. 3d 369, 399 (S.D.N.Y. 2015) ("[C]ombination in this context means taking some components comprising elements of the claim and combining them independently with other components to create an infringing product. Under that scenario, the supplier of one portion of the claim elements is not a direct infringer because someone else 'make[s] the patented invention.'"); *Energy Heating, LLC v. Heat On-the-Fly, LLC,* Case No. 4:13-CV-10, 2013 WL 5954805, at *7 (D.N.D. Nov. 6, 2013) (no infringement where a product required multiple components from multiple parties to meet all claim elements).

But when a customer-retailer puts Campbell-supplied soup cans into Campbell-supplied racks, the customer-retailer is not making or using some new, infringing product: It is assembling the infringing product, the components of which all came from Campbell. For this reason, the district court in *On Track Innovations*, 106 F. Supp. 3d at 398, rejected defendant T-Mobile's argument that the plaintiff there had failed to establish direct infringement as a matter of law where the plaintiff could "only demonstrate that T-Mobile has offered to sell both the … phones and the SIM cards, which purchasers may then elect to combine and activate." Distinguishing both *Cross Medical* and *Centillion* in a similar fashion as the Court does here, *On Track Innovations* concluded that T-Mobile—not its customers—was liable for direct infringement where "the technology T-Mobile sold merely require[d] the customer to assemble parts sold by T-Mobile into a single structure." *Id.* at 399. *Cf. EBS Auto. Servs. v. Ill. Tool Works, Inc.*, No. 09-CV-996 JLS MDD, 2011 WL 4021323, at *6 (S.D. Cal. Sept. 12, 2011) ("[S]uffice it to say that the patent laws do not allow a

15

manufacturer to avoid infringement simply by selling a disassembled device that would infringe on assembly.").[2]

At bottom, it does not matter that the racks and cans were shipped separately to customer-retailers by different entities, and it does not matter that the evidence does not demonstrate that Campbell (the individual defendant) exclusively loaded the soup cans onto the racks itself. That Campbell (the individual defendant) controlled the supply of both racks and cans to its customer-retailers, for its own benefit, is enough to find that Campbell, Kroger, and Meijer all directly infringed Claim 17 of the '111 patent and Claim 1 of the '326 patent.

### B. Campbell's Direct Infringement of the Group C Racks

Campbell makes one non-infringement argument as to the Group C racks: that the products loaded into the racks are not cylindrical within the meaning of the claim because the tops of the cans and the bottoms of the cans have different diameters. [481] at 8–9. Campbell asks that the jury decide whether these products satisfy the ordinary meaning of the "generally cylindrical" claim limitation. *Id.* at 9.

---

[2] Campbell suggests *On Track Innovations* and *EBS Auto Services* are distinguishable because the infringing defendant in each of those cases alone supplied all of the components of the accused device, whereas Campbell (the individual defendant) commissions Trinity to manufacture the racks. [493] at 2–4. Campbell similarly distinguishes *Paper Converting Machine Company v. Magna-Graphics Corporation*, 745 F.2d 11 (Fed. Cir. 1984), and *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 49 F.3d 1551 (Fed. Cir. 1995), two other cases upon which Gamon relies. *Id.* The Court does not read these cases as narrowly as Campbell. None of these cases hold that a defendant can circumvent liability for infringement by directly supplying one component of the accused device and then orchestrating the supply of the other necessary component by outsourcing its manufacture to another entity.

This argument was foreclosed in the Claim Construction Order. [372]. There, Campbell urged the court previously assigned to this matter to adopt the same meaning that it urges this Court to adopt now: that the phrase "[a] plurality of generally cylindrical products all having substantially equal diameters" really means "a plurality of products having a shape of or relating to a cylinder where each of the products has approximately the same outer diameter." *Id.* at 10. The previous court rejected this construction as "inject[ing] a restriction not present in the claim as written" and determined that the claim "contemplates that the products may vary in diameter, whether within a single product or amongst the product group." *Id.* It added: "[N]othing in the claims precludes the use of cylindrical products possessing non-uniform diameters." *Id.* Because Campbell's argument was already explicitly rejected, this Court will not let it advance to the jury. *See Solaia Tech. LLC v. ArvinMeritor, Inc.,* 361 F. Supp. 2d 797, 816 (N.D. Ill. 2005) (declining to revisit on summary judgment claims that the court already construed).

Where Gamon has provided substantial evidence of infringement, *see* [450] at 6–7, and Campbell has not rebutted it, the Court grants Gamon's motion for summary judgment of infringement as to the Group C racks. *See Robertson Transformer,* 149 F. Supp. 3d at 933–34.

## C. Campbell's and Trinity's Indirect Infringement

Gamon alleges that Campbell and Trinity (but not Kroger and Meijer) have induced infringement and engaged in contributory infringement. [476] at 9–10, 13–14. Induced infringement and contributory infringement are both forms of indirect

infringement. *See* 35 U.S.C. §§ 271(b), (c). For the reasons set forth next, the Court agrees with Gamon that these are claims a jury must decide.[3] [476] at 10–14.

To show that a defendant induced infringement, the plaintiff must show that the defendant's actions induced infringing acts, and that the defendant knew or should have known its actions would induce infringement. *Lucent Tech., Inc. v. Gateway Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009). Inducement requires evidence of culpable conduct, such as encouraging another party's infringement or advertising an infringing use. *Id.* Contributory infringement imposes liability on a defendant who (1) sells a component, (2) that it knows is especially designed for use in a patented invention, and (3) the component is not a staple of commerce suitable for a substantial non-infringing use. *See Ricoh Co., Ltd. v. Quanta Comput. Inc.,* 550 F.3d 1325, 1337 (Fed. Cir. 2008); *Artrip v. Ball Corp.,* 735 F. App'x 708, 710 (Fed. Cir. 2018) (defendant must know its product was made to be used in an infringing manner).

In seeking judgment in their favor on indirect infringement, Campbell and Trinity do not advance different arguments as between induced infringement and contributory infringement. *See, e.g.*, [496] at 13–14. The Court therefore takes induced infringement and contributory infringement in tandem when discussing the

---

[3] According to Gamon, where Campbell (the individual defendant) is liable for direct infringement, the Court need not address whether it is separately liable for indirect infringement. [505]. Campbell takes a contrary position. It explains that the Court should separately determine whether it is liable for indirect infringement, even if it is already liable for direct infringement, "to allow for a correct assessment of Gamon's potential damages." [504] at 1. Based on Campbell's reasoning, the Court considers liability for indirect infringement.

two positions Campbell and Trinity advance to argue that they are not liable for indirect infringement as a matter of law.

### 1. Pre-Issuance Indirect Infringement

Campbell and Trinity argue that because many racks were sold and shipped before the '111 and '326 patents issued, neither engaged in indirect infringement as a matter of law with respect to any racks shipped before that point in time. [496] at 1, 9–11. This argument only gets Campbell and Trinity so far.

As these defendants correctly point out, *see id.* at 9, "inducement of infringement under § 271(b) does not lie when the acts of inducement occurred before there existed a patent to be infringed." *Nat'l Presto Indus., Inc. v. W. Bend Co.,* 76 F.3d 1185, 1196 (Fed. Cir. 1996). This rule applies even when the defendant had knowledge of a pending patent application and the intent that, as a direct result of its actions, there would be direct infringement by others after the patent issued. *Id.*; *see also Black & Decker (U.S.), Inc. v. Home Prod. Mktg., Inc.*, 929 F. Supp. 1114, 1121 (N.D. Ill. 1996) ("As a matter of law, inducement of infringement does not reach actions taken before the patent is issued."); *Magarl, L.L.C. v. Crane Co.,* Case No. 1:03-CV-01255, 2004 WL 2750252, at *2 (S.D. Ind. Sept. 29, 2004) ("[T]his is [a] bright line rule which applies even if the defendant was aware that the patent was about to issue and intended that it would be infringed.").

Still, acts occurring before a patent's issuance may remain relevant to an induced infringement claim where the acts of inducement continue after the patent's issuance. *See, e.g., GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.,* No. CV 14-878-

19

LPS-CJB, 2016 WL 3946770, at *10 (D. Del. July 20, 2016), *report and recommendation adopted*, No. CV 14-878-LPS-CJB, 2017 WL 1050574 (D. Del. Mar. 20, 2017). As the court in *GlaxoSmithKline LLC* reasoned:

> The question is whether a party had the intent to and did encourage the wrongful act of patent infringement in the relevant time frame—*after* a patent has issued ... And surely it seems possible that what the party did and said *before* the patent issued might at least *bear on* what its mindset was in the crucial post-issuance time period (so long as that party did, in fact, perform an inducing act in that post-issuance time period).

*Id.* at *11.[4] *See also L.A. Biomed. Rsch. Inst, at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, Case No. LA CV13-08567 JAK (JCGx), 2014 WL 11241786, at *3 (C.D. Cal. May 12, 2014) (declining to dismiss an induced infringement claim where culpable conduct began before the issuance of the patent because "the complaint contains allegations of continued culpable conduct after the issuance of the patent"); *CreAgri, Inc. v. Pinnaclife Inc.*, Case No. 5:11-CV-06635-LHK, 2013 WL 3958379, at *4-5 (N.D. Cal. July 29, 2013) ("The Court is not persuaded that [the defendant's] activities cannot support an inference of intent simply because the activities began before the [asserted patent] was issued. To the extent [the defendant] continued these activities after the patent was issued, the continued activities reflect an intent to infringe upon the [asserted] [p]atent."); *Black & Decker (U.S.), 929* F. Supp. at 1121 (defendant

---

[4] In affirming the jury's verdict that the defendant in this matter had induced infringement, the Federal Circuit explained that substantial evidence supported that conclusion where, among other things, the jury saw evidence that a press release issued pre-patent remained available on the defendant's website post-patent issuance. *See GlaxoSmithKline LLC v. Teva Pharmaceuticals, USA, Inc.,* 7 F.4th 1320, 1337–38 (Fed. Cir. 2021).

induced infringement when it did not attempt to retrieve samples of an infringing product it had distributed pre-issuance after the product's patent issued).[5]

Put simply: A defendant cannot be liable for inducing infringement *before* a patent was issued. And liability for indirect infringement cannot be based solely on pre-issuance conduct.[6] But as the above-cited cases persuasively explain, if a defendant continued to induce infringement *after* the patent was issued, it can be held liable for post-issuance inducement, and actions a defendant took *before* the patent was issued may inform a determination of this post-issuance liability.

Gamon points to several pieces of evidence from which a jury could reasonably conclude that Campbell and Trinity engaged in post-issuance inducement. For example, Gamon cites:

- Three sets of installation instructions, issued by Trinity, for "Campbell's Shelf Maximizer System" and "Campbell's Flex Maximizer/Optimizer System." [500] ¶¶ 23–25; [447-13], [447-14], [447-15]. Two of the instructions are dated in 2008, [447-14], [447-15], while the third is undated, [447-13]. Gamon alleges that Trinity and Campbell never withdrew these instructions following its patents' issuance. [500] ¶ 88.

- A 2016 Campbell presentation encouraging the "[u]se [of its] Maximizer racks to showcase variety and drive increased sales," and noting that the racks "make it more difficult to move Condensed [soup] off of the aisle lead without

---

[5] *See also Black & Decker (US) Inc. v. Catalina Lighting, Inc.,* 953 F. Supp. 134, 139 n.10 (E.D. Va. 1997) ("[P]roviding products to retailers on consignment before the date of notice might be relevant if such actions (i) give rise to a duty to recover these products after the notice date, and (ii) the failure to recover the products aids or abets a retailers' direct infringement."); *E.I. DuPont De Nemours and Co. v. Monsanto Co.,* 903 F. Supp. 680, 736–37 (D. Del. 1995) (where the defendant learned that a patent was to be issued on a product it supplied, and where defendant continued supplying the infringing product, defendant actively induced infringement).

[6] And no pre-issuance damages are available for induced infringement. *Puma Biotech., Inc. v. AstraZeneca Pharm. LP,* 723 F. Supp. 3d 327, 354 (D. Del. 2024).

clear data to support change." It also provided a "Recommended Condensed Layout" for customer-retailers using the racks. [ -34] at 3, 5, 6.

- A 2017 Campbell presentation recommending the use of the racks for condensed soup, [477-31] at 3, in order to simplify navigation and efficiency, *id.* at 9.

- A 2020 Campbell presentation highlighting the "critical role" the racks play "in improving the shopping experience across the total aisle," while comparing the benefits and challenges of using racks. [477-33] at 17–19.

- A 2020 Campbell presentation in partnership with Meijer claiming that the "racks improve shopper perception of findability, organization, and variety/assortment," and that one in three shoppers say the rack will increase their likelihood of buying soup. [477-35] at 66–67.

- A 2021 "Soup Category Review" from Campbell claiming that racks improve shopability, findability, and brand visibility. [477-36] at 36.

- A 2022 Campbell presentation noting that "[r]etailers with condensed racks performed better than the stores with no racks," and providing a diagram for rack use. [477-32] at 18, 22.

- Testimony from a Campbell representative, who served as Senior Manager of Category Strategy focused on the soup and broth business from February 2020 through July 2020, that one of her primary responsibilities was "to create [Campbell's] shelving recommendations for the soup and broth category that [it] share[s] with [its] retailers ... IQ Maximizer racks are one of the elements in shelving." [447-29] at 20–21.

- Testimony from a Meijer representative that "Campbell's handles the maintenance" of the racks, and that "[i]f a rack breaks, [Meijer] would contact Campbell's, and Campbell's would go and update the store and replace the rack." [447-27] at 205.

In light of this and other evidence, the Court cannot conclude as a matter of

law that Campbell and Trinity did not engage in indirect infringement of the '111 and

'326 patents.[7] Rather, from this evidence, a reasonable jury could find that Campbell and Trinity engaged in indirect infringement post-issuance by encouraging customer-retailers to utilize the racks and facilitating their use of the racks. *See, e.g.*, *Black & Decker (U.S.),* 29 F. Supp. at 1121. Moreover, owing to this evidence of post-issuance conduct, the Court cannot conclude that actions taken by Campbell and Trinity pre-issuance of the patents are *per se* irrelevant as evidence of post-issuance indirect infringement.

### 2. Pre-Litigation Knowledge of the Patents

Campbell and Trinity argue that Gamon's claims of indirect infringement "fail," as Gamon cannot establish the required pre-litigation knowledge of the patents. [496] at 2, 14–15. This argument is contrary to the record before the Court.

That record includes the 2006 Request for Proposal that Campbell sent to Trinity for the design and manufacture of soup racks. [447-49]. In that request—sent after Gamon filed the application that led to the '111 patent—Campbell alerted Trinity of the parent patent to the instant patents. *Id.* at 3. Campbell wrote: "Gamon

---

[7] In their reply in support of their non-infringement motion, Campbell and Trinity argue that Gamon forfeited indirect infringement arguments by failing to specify what acts constituted indirect infringement, as required by LPR 2.2(e). [493] at 7–9. The Court disagrees with Campbell's and Trinity's characterization of Gamon's final infringement contentions. There, Gamon alleged that "Campbell and Trinity instruct, aid, assist, and encourage the infringement by retailers such as Meijer and Kroger (inducement) and offer to sell or sell dispenser and display rack systems that are non-staple articles or commodities of commerce unsuitable for substantial non-infringing use (contributory)." [447-10] at 7. It added that, "[f]or example, Trinity and/or Campbell's 'Campbell's Shelf Maximizer System Installation Instructions' provides instructions on assembling and loading the dispenser and display rack systems of the Accused Instrumentalities with soup cans that are generally cylindrical products all having substantially equal diameters and heights." *Id.* These allegations are sufficient to put Campbell and Trinity on notice of the specific acts underlying Gamon's indirect infringement argument, including the acts outlined above.

also has other patent applications pending based on this patent, and attention should be paid to any claims that Gamon may be attempting to patent in these applications." *Id.*

Moreover, Trinity's president testified that he was "sure" he and Campbell had discussed the issuance of the '111 patent and the scope of the '111 claims, *see* [477-4] at 119; that he could not imagine that Trinity and Campbell did not have conversations regarding the '111 patent at the time of its issuance, *id.* at 118–19; that it was normal practice for him to discuss with Campbell "any analysis that Trinity might have obtained about a Gamon patent or patent application," *id.* at 40; and that Trinity talked to Campbell "all the time about [the '111 patent]," *id.* at 49–50. When asked whether he had any recollection of speaking to anyone at Campbell regarding the '111 patent, Trinity's president responded that he had no "specific recollection," but did not deny that any such conversation ever took place. *Id.* at 124.

Campbell argues that the court previously assigned to this matter "already has rejected Gamon's claims of Campbell's pre-suit knowledge of the patents-in-suit." [493] at 9–10 (cleaned up). The order Campbell cites to support this proposition considered whether two pre-issuance emails were sufficient to prove willful infringement and determined that they were not. [414] at 3–4. But the question here is a different one: whether, based on all the evidence Gamon now has put forth, a jury could reasonably find that Campbell and Trinity had pre-suit knowledge of the patents.

24

Based on the evidence summarized above, a reasonable jury could readily infer that Campbell and Trinity had knowledge of Gamon's patents pre-litigation. As a result, judgment as a matter of law on indirect infringement cannot be granted in Campbell's and Trinity's favor.

## III. Gamon's Motion for Partial Summary Judgment Regarding Prior Art and Invalidity Related to the Eveready Dispenser

Gamon seeks partial summary judgment that the Eveready Dispenser is not prior art relative to its patents and that its patents are not invalid in light of the Eveready Dispenser, a small rack used by retailers to dispense batteries. [445]. All defendants oppose Gamon's motion. [478]. For the reasons set forth next, the Court denies Gamon's motion.

A person is not entitled to a patent if their invention constitutes prior art. 35 U.S.C. § 102. An invention constitutes prior art if it was previously "known or used by others in this country," or if it was "in public use or on sale in this country" more than one year before the date of the patent application. *Id.* If the differences between the patent and the prior art "are such that the claimed invention as a whole would have been obvious … to a person having ordinary skill in the art to which the claimed invention pertains," the patent may be found "obvious" and therefore invalid. 35 U.S.C. § 103. Gamon asks the Court to determine, as a matter of law, that the Eveready Dispenser is *not* prior art relative to its '111 and '326 patents and, therefore, that its patents are *not* invalid based on the Eveready Dispenser. [445] at 1. To prevail on its claim of validity, Gamon must show that defendants "failed to produce clear

and convincing evidence … upon which a reasonable jury could invalidate the patent." *Eli Lilly & Co. v. Barr Lab'ys, Inc.,* 251 F.3d 955, 962 (Fed. Cir. 2001).

Defendants' expert report of invalidity of the '111 and '326 Patents (the "May Report") offers nine grounds of invalidity. [444-2]. Pertinent to Gamon's motion, the May Report concludes that the Eveready Dispenser—which was offered for sale in 1965, decades before Gamon applied for either of its patents—"represents prior art to the Asserted Claims of the Asserted Patents." *Id.* ¶¶ 104, 135. Therefore, the May Report posits, the '111 and '326 patents are invalid. The May Report relies on two pieces of evidence to support this conclusion: (1) a physical Eveready Dispenser and (2) a 1965 Price List. [480-1]; [446-4].[8]

For the Court to consider these items at summary judgment, they must be capable of authentication at trial. *See Montoya v. Mitchell*, Case No. 1:17-CV-01796, 2024 WL 1328799, at *3 (N.D. Ill. Mar. 28, 2024). But "[o]nly a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker,* 698 F.3d 988, 999 (7th Cir. 2012).

To authenticate an item of evidence under the Federal Rules of Evidence, its proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The Rules of Evidence offer several non-exhaustive ways to satisfy this requirement. Rule 901(b)(3), for example, allows an expert witness or a trier of fact to authenticate evidence through

---

[8] Although defendants earlier raised a third piece of evidence, the Hardware Age Magazine, they no longer rely on it to oppose Gamon's motion for partial summary judgment. [478] at 5.

comparison to an authenticated item. Rule 901(b)(4) allows evidence to be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." And then there is self-authentication: Rule 902(7) provides that "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control" need not be supported by extrinsic evidence of authenticity.

***Authentication of Eveready Dispenser.*** In light of these guidelines, the Court concludes that defendants' physical Eveready Dispenser is capable of authentication at trial for three reasons:

First, the Eveready Dispenser bears a label with the Eveready trademark—in other words, an "inscription … indicating origin, ownership, or control." Fed. R. Evid. 902(7). It is therefore self-authenticating. *See also United States v. Saguil,* 600 F. App'x 945, 947 (5th Cir. 2015) (sticker stating "Made in Japan" is self-authenticating); *Ultra-Mek, Inc. v. United Furniture Indus., Inc.*, Case No. 1:18CV281, 2022 WL 1632946, at *1 (M.D.N.C. Apr. 11, 2022) (where "Bradington" brand name and logo "appear[ed] to have been applied to the Bradington sofa in the course of business and indicate[d] its origin from Bradington," the sofa "[fell] squarely within the heartland of Rule 902(7)").

Second, in addition to bearing the Eveready trademark label, the Eveready Dispenser features the words "Flashlight Batteries" and "Power To Spare"; a model number (No. F-6000); and the name "Union Carbide." [480-1]. It is also depicted as being used to store and dispense batteries. *Id.* Given these aspects of the Eveready

27

Dispenser's "appearance … or other distinctive characteristics, taken together with all the circumstances," under Rule 901(b)(4), a jury could separately reasonably infer that the Eveready Dispenser is precisely what defendants assert it to be.

Third, the Eveready Dispenser is capable of authentication under Rule 901(b)(3), which permits authentication by comparing one piece of evidence to an authenticated item. Here, defendants' expert, or the jury, could compare the actual Eveready Dispenser to information available in the Price List (the authentication of which the Court discusses *infra*). That information includes an image of the Eveready Dispenser sketched alongside the dispenser's identifying information; the dispenser's model number (No. F-6000); the dispenser's measurements; and an effective date of "February 15, 1965." [446-4] at 1, 7.[9] By comparing the actual proffered dispenser to the Price List—and noting the corresponding, overlapping nature of the two items—a jury could reasonably conclude that the Eveready Dispenser is precisely defendants purport it to be.[10]

---

[9] Statements in authenticated documents that were prepared before January 1, 1998, are not hearsay. Fed. R. Evid. 803(16).

[10] Gamon's citation to *Deckers Outdoor Corp. v. Romeo & Juliette, Inc.* is inapposite. 2017 WL 2604086, at *3 (C.D. Cal. June 13, 2017). In this out-of-district case, the defendant provided two items to support its contention that an at-issue boot was prior art, sold between 2004 and 2008: an email sent from the defendant's CEO to its counsel stating that the boots were sold between those dates, and pictures of boots. *Id.* The email (which was also inadmissible hearsay) did not describe what the boots looked like, and the boots in the pictures bore no labels or other distinguishing features. *Id.* Because there was no way to determine that the boots described in the email were the same as the pictured boots, the district court in *Deckers* concluded the pictures could not be authenticated, and that the boots did not constitute prior art. *Id.* ("All we know is that some boot called 'Rebels Cayenne boot' was offered for sale between 2004 and 2008; there is no evidence that the boots in these pictures (which form the entire basis of the obviousness analysis) are in fact the 'Rebels Cayenne boot,' and thus there [is] no evidence that the boots in those pictures were offered for sale in the relevant time frame."). There was nothing in *Deckers* like the Price List that defendants offer here.

***Authentication of the Price List:*** The Price List is capable of authentication under Rule 901(b)(4). Its cover page bears the distinctive Eveready Trademark and a 1965 effective date. [446-4] at 1. The page that follows includes a table listing information for Eveready's other products: catalog numbers; item descriptions, quantities, and weights; and suggested prices. *Id.* at 2. The top right of page 7 includes a sketch of what appears to be the Eveready Dispenser and lists the model number, along with suggested prices for dealers and retailers. *Id.* at 7.

From these characteristics, the jury could find that the Price List is what defendants purport it to be—a price list, circa 1965, for the Eveready Dispenser.

\* \* \*

Having concluded that defendants have produced evidence capable of authentication to support their prior art and invalidity defense, the Court also concludes that a genuine issue of material fact exists as to the Eveready Dispenser's availability in 1965. For the same reasons already articulated, a jury could reasonably conclude from the physical Eveready Dispenser and the 1965 Price List that the Eveready Dispenser was available for sale in 1965. Such a finding would be further supported by the fact that the Price List, with its 1965 effective date, offers a "Salesmaster Assortment" for sale. [446-4] at 9.

Gamon therefore has failed to show that defendants cannot make a *prima facie* case of invalidity based on the Eveready Dispenser, and its motion for partial summary judgment is denied.

## IV.    Conclusion

For the reasons stated above, Gamon's motion for summary judgment on the issue of infringement is granted as to direct infringement by defendants Campbell, Kroger, and Meijer. [448], [450]. Defendants' motion for partial summary judgment of non-infringement is denied. [438]. Gamon's motion for partial summary judgment regarding prior art and patent invalidity is denied. [443], [445].

The Court will issue a separate minute order setting a status hearing for the parties to discuss next steps in this matter.

_____
Georgia N. Alexakis
United States District Judge

Date: January 22, 2025