UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAMON PLUS, INC., et al.,

        Plaintiffs,

        v.

THE CAMPBELL'S COMPANY F/K/A
CAMPBELL SOUP COMPANY, et al.,

        Defendants.

No. 15 CV 8940

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Gamon Plus, Inc. and Gamon International, Inc. ("Gamon") sues The Campbell's Company ("Campbell"), The Kroger Co. ("Kroger"), Meijer, Inc. ("Meijer"), and Trinity Manufacturing, LLC ("Trinity")[1] for directly infringing two patents it owns: United States Utility Patent Nos. 8,827,111 ("the '111 patent") and 9,144,326 ("the '326 patent"). [275]. Specifically, as the Court found at summary judgment, [214], Campbell directly infringed the patents by using the "IQ Maximizer" gravity-feed racks ("racks") to display and sell its soup cans at grocery stores throughout the nation. Gamon also alleges that Campbell and Trinity are liable for indirectly infringing the patents by inducing, and contributing to, their infringement—issues to be decided at the upcoming trial, along with Campbell's defenses.

Before the Court are the parties' motions to exclude the opinions of two damages experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell*

---

[1] The Court refers to the defendants collectively as "Campbell."

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For the reasons stated below, the Court grants Campbell's motion to exclude the opinions of Gamon's damages expert, Roy Weinstein, [535], and denies Gamon's motion to partially exclude the opinions of Campbell's damages expert, Dana Trexler, [531].

## I. Legal Standards

The admission of expert testimony is governed by Rule 702 and the principles outlined in *Daubert*, 509 U.S. at 579. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that expert testimony is admissible if the proponent demonstrates to the Court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court performs a gatekeeping function, preliminarily assessing expert testimony to ensure it is reliable and relevant, in compliance with Rule 702. *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). When reviewing an expert opinion for reliability, the Court assesses "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509

U.S. at 592–93. As to relevancy, the Court considers whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

All expert witness testimony is also subject to a balancing test under Rule 403 of the Federal Rules of Evidence. Rule 403 provides that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## II.    Campbell's Motion to Exclude Weinstein's Testimony

Campbell seeks to bar Weinstein's testimony altogether. It takes serious issue with Weinstein's selection of soup sales as the royalty base, a bedrock choice that drives his damages calculations. For the reasons that follow, the Court agrees with Campbell that Weinstein's damages calculations are based on erroneous facts and data, are not the product of reliable principles and methods, and reflect an incorrect application of established principles and methods. The Court therefore bars Weinstein's opinions under Rule 702.

### A.  Gamon's Reliance on Legal Authority To Support Weinstein's Use of Campbell's Soup Sales as a Royalty Base Is Overstated.

Gamon seeks damages as a "reasonable royalty." 35 U.S.C. § 284. Reasonable royalties are typically calculated through a "hypothetical negotiation," which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *EcoFactor, Inc. v. Google LLC,* 137 F.4th 1333, 1340 (Fed. Cir. 2025). Fifteen factors, outlined in

*Georgia-Pacific Corporation v. U.S. Plywood Corporation,* inform the hypothetical negotiation. 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Reasonable royalties are determined by multiplying the "royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee."[2] *Whitserve, LLC v. Computer Packages, Inc.,* 694 F.3d 10, 27 (Fed. Cir. 2012); *Virnetx, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units."); *Lucent Tech., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1339 (Fed. Cir. 2009) (all running royalties have at least two variables: the royalty base and the royalty rate).

Rather than use the revenue of Trinity's rack sales to Campbell to calculate the royalty base, Weinstein's royalty calculation is based upon Campbell's soup sales. [539-1] ¶ 113. Weinstein starts with Campbell's total soup sales during the relevant period ($21.8 billion), $8.2 billion of which he estimates are from cans displayed in the racks. *Id.* ¶¶ 92–95. From there, Weinstein estimates that the racks increased sales by 8.1% (for condensed soups) and 8.7% (for ready-to-serve soups). *Id.* ¶ 113. Applying Campbell's gross margin, Weinstein concludes that, by using the racks, Campbell realized $219 million in incremental profit. *Id.* He opines that, in a

---

[2] For example, if a plaintiff licensed a third party to sell the plaintiff's patented product at a 30% royalty rate, the plaintiff would receive 30% of the profits (the royalty base) each time the third-party licensee sold one of its patented products. *Fototec Int'l Corp. v. Polaroid Corp.,* No. CIV.A.1:94CV-821-FMH, 1996 WL 263651, at *5 (N.D. Ga. Feb. 21, 1996).

hypothetical negotiation, Campbell and Gamon would agree to split this $219 million either "based on Campbell's standard rate of return" or "based on Campbell's historical gross profit margin." *Id.* ¶¶ 114–15, 118. Weinstein concludes that Campbell would owe Gamon either $188.2 million or $ 143.7 million (depending on the basis for the split), with Kroger and Meijer owing $14.7 million and $8.4 million, respectively. *Id.* ¶¶ 115, 118, 123, 128.

A common theme underlying Campbell's criticism of Weinstein's report is his failure to distinguish royalty *rate* from royalty *base*. Weinstein and Gamon argue that Campbell's use of, and benefit from, the racks should factor into the reasonable royalty. Campbell agrees to some degree but points out that a defendant's use of an infringing product goes towards the royalty *rate* (the percentage of revenue owed to the patentee) rather than the royalty *base* (the revenue generated by the infringement). *See, e.g.*, [576] at 1; *Whitserve,* 694 F.3d at 27; *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC,* 927 F.3d 1292, 1302 (Fed. Cir. 2019) ("[W]hen an expert calculates a running royalty by using the price of such a product as a royalty base to be multiplied by a percentage rate, the size of the base must be suitably limited to avoid a prejudicial effect on a jury determination."). In Campbell's view, soup profits may impact the royalty rate, but not the royalty base, which should instead start with Trinity's rack sales to Campbell. [551] at 1. In Gamon's view and Weinstein's opinion, rack sales have no role in the calculation: Soup sales form the royalty base.

To support its position, Gamon cites *Powell v. Home Depot,* 663 F.3d 1221 (Fed. Cir. 2011). There, Home Depot installed infringing saw guards on saws available for in-store use. *Id.* at 1239–40. Beyond saving employees from injury (and Home Depot from the resulting liability), the now-guarded saws meant higher custom-cut lumber sales and complementary purchases, like nails and hinges. *Id.* at 1240. Those benefits increased the per-saw-guard estimated profit. *Id.* at 1239. But crucially, *Powell* did not throw the saw guards' revenue to the side and base royalties on lumber sales or door hinges. Rather, the royalty base remained the saw guards' revenue, while the royalty rate accounted for the increased lumber and complementary purchase profits. *Id.*

Gamon's reliance on *Trans-World Manufacturing Corporation v. Al Nyman & Sons, Inc.,* 750 F.2d 1552 (Fed. Cir. 1984), is similarly overstated. There, the Federal Circuit allowed that the defendant's profits from the sale of nonpatented eyeglasses— which were sold on infringing display racks—"could be *relevant* in determining the amount of a reasonable royalty" because, for example, "if … sales were increased because of the infringing use of the displays, that fact could affect the amount of royalties a potential licensee would be willing to pay." *Id.* at 1568 (emphasis added). As Campbell points out in its reply, it does not dispute that proposition. But that proposition is more limited than the one for which Gamon advocates: that soup sales are, by definition, a permissible royalty base. And the subsequent history in the *Trans-World* litigation demonstrates that point. On remand, the district court awarded plaintiff reasonable royalty damages after multiplying (1) the number of

infringing display racks purchased by the defendant by (2) the *plaintiff's* profit margin on its racks. *See Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 633 F. Supp. 1047, 1056–57 (D. Del. 1986). Defendant's eyeglass sales were not part of the equation.[3]

That is all to say: It is true that the benefit a defendant derives from an infringing product may figure into the reasonable royalty calculus in some way. But there is no requirement that the benefit serve as the royalty *base* and, indeed, in the factually analogous *Powell*, it served as the royalty *rate.* 663 F.3d at 1239–40. Neither Weinstein nor Gamon grapple with this distinction, and in neglecting to do so, they undermine the Court's confidence that Weinstein's damages calculation satisfies the requirement that an expert's opinion "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

### B. Weinstein's Apportionment Analysis Is Flawed.

No matter what the method of calculation, "a patentee must take care to seek only those damages attributable to the infringing features." *Virnetx,* 767 F.3d at 1326 (a reasonable royalty may not "overreach and encompass components not covered by the patent"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018)

---

[3] In the other two cases Gamon cites, the infringing products were never sold, so no royalty base existed. *United Servs. Auto. Assoc. v. PNC Bank N.A.*, 2:20-cv-00319, 2022 WL 1177880, at *2–3 (E.D. Tex. Apr. 19, 2022) (where the infringed product was mobile remote check-depositing software that was never directly sold to customers, the plaintiff's expert could opine regarding the benefits the infringing bank incurred from its use of the check-depositing software (including attracting younger customers and selling younger customers certain highly profitable services)); *Parallel Networks LLC v. Autoflex Leasing, Inc.,* No. 5:07-cv-125, 2008 WL 8781701, at *3 (E.D. Tex. Aug. 19, 2008) ("[T]he patented method in this case is not sold but merely used to make sales possible."). Because the racks *were* sold, and because Gamon does not argue that calculating a royalty base would be otherwise impossible, these cases are not helpful to resolving this motion.

("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."). This process— separating the value attributable to the infringing features from those attributable to the non-infringing features—is known as an "apportionment analysis." "Undertaking an apportionment analysis where reasonable royalties are sought generally requires a determination of the royalty base to which the royalty rate will be applied." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 904 F.3d 965, 977 (Fed. Cir. 2018).

The Court now turns to three principles concerning apportionment analysis: (1) the Smallest Salable Patent-Practicing Unit ("SSPPU") doctrine; (2) convoyed sales; and (3) the Entire Market Value Rule ("EMVR"). For the reasons that follow, Weinstein's approach to, and application of, each of these principles is flawed, thus rendering his opinions inadmissible under Rule 702.

## 1. The Smallest Salable Patent-Practicing Unit

In a suit for patent infringement, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. In a multi-component product, where one component is patented and others are not, the reasonable royalty must be based on the smallest salable patent-practicing unit, or "SSPPU." *Power Integrations,* 904 F.3d at 977 ("[W]here multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the

patented invention.").[4] The SSPPU doctrine prevents the admission of overall revenues for the accused device, "which have no demonstrated correlation to the value of the patented feature alone." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67–68 (Fed. Cir. 2012). Otherwise, the Court risks prejudicing or misleading the jury. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("[W]here a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product."); *Realtime Data LLC v. EchoStar Corp.,* No. 6:17-CV-00084-JDL, 2018 WL 6266301, at *4 (E.D. Tex. Nov. 15, 2018) ("Disclosure of an end product's total revenue may make a patentee's proffered damages amount appear modest by comparison, thus risking the jury may artificially inflate their damages calculation beyond that which is adequate to compensate for the infringement.").

If the parties do not dispute the underlying facts, the SSPPU determination is an issue of law. *See LaserDynamics,* 694 F.3d at 66 (affirming the district court's grant of a new trial on damages based on LaserDynamics' failure to comply with the entire market value rule and SSPPU doctrine); *Cornell Univ. v. Hewlett–Packard*

---

[4] Where, for example, the infringed invention was a disc drive for use within a laptop, the disc drive (not the laptop) was the SSPPU. *LaserDynamics,* 694 F.3d at 56–57, 68–69. Where the infringed invention was a calendar tool in Outlook, the tool (not Outlook) was the SSPPU. *Lucent Techs.,* 580 F.3d at 1337. And where the infringed item was a coin selector device used in laundry machines, the device (not the laundry machine) was the SSPPU. *Imonex Servs. v. W.H. Munzprufer Dietmar Trenner GmBH,* 408 F.3d 1374, 1376, 1380 (Fed. Cir. 2005). But where a patent's asserted claims described a "watercraft" with a "rigid body" and "an interface" for mounting a propulsion mechanism, the entire kayak (not just the propulsion-mounting interface) was the SSPPU. *Pelican Int'l, Inc. v. Hobie Cat Co.,* 655 F. Supp. 3d 1002, 1044 (S.D. Cal. 2023); *see also Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC,* 879 F.3d 1332, 1348 (Fed. Cir. 2018) (where a patent described a "multiblade lawn mower" with improved "baffles," the SSPPU was an entire lawn mower, not the baffles).

*Co.,* 609 F. Supp. 2d 279, 287 (N.D.N.Y. 2009) (granting judgment as a matter of law and holding that "no reasonable jury could have relied on this royalty base in determining Cornell's damages award" because it conflicted with the SSPPU).

Gamon argues that the "SSPPU rule" does not apply here because "the patent claims cover the entire system, namely the rack and soup cans, not just a component thereof." [568] at 8; *id.* at 1 ("[S]oup cans **are** an expressly claimed element of the patented system."); *id.* at 10 ("As cylindrical cans are included in the invention, no unpatented component parts are implicated."). This argument is inconsistent with the record.

First, the patents themselves do not "cover," "include," or "expressly claim[]" Campbell's soup. The patents are titled "Multi-Chute Gravity Feed Dispenser Display," and the "brief summary" only describes the rack's "panels," "chutes," and "rails," which "stop[] the products for viewing." [275-1] at 30; [275-3] at 30. The '111 patent allows that, although the product depicted in a certain image "represents cans of consumer goods," "[o]ther embodiments use … a jar, including glass, plastic or other typical jar materials" and "additional embodiments use products of a variety of other shapes or packaging designs, otherwise capable of being received by chutes." [275-1] at 32 (cleaned up). Gamon does not point to anywhere in the patents themselves where soup cans are "expressly claimed." [568] at 1.

Nor does the parties' claim construction chart mention "soup" or "can." The only claim that comes close describes a "display rack comprising: A plurality of generally cylindrical products all having substantially equal diameters." *See* [372] at

10

5 (quoting claims 17 and 27 of the '111 patent and claim 1 of the '326 patent). The phrase "generally cylindrical products" could refer to countless items well beyond Campbell's soup cans (e.g., soda cans, jars of pickles, batteries).

And as the previous district judge's claim construction order made clear, the presence of "generally cylindrical products" (let alone soup cans specifically) is not a necessary condition of the patents' infringement. Rather, the patents describe a "display rack structure that allows for certain functionality," such that the patents "would be infringed if the structure *were designed as specified to allow for such functionality."* [372] at 20 (emphasis added); *see also id.* at 23 (language concerning the loading of products into the racks "simply represent[s] permissible functional language used to describe the capabilities of the claimed display rack."). Infringement occurs "when one makes, uses, offers to sell, or sells the claimed display rack": not when the rack is loaded with cans. *Id.* at 26. The Court's summary judgment opinion supports this analysis, finding that the patents' claims "recite a display rack structure that *allows for certain functionality*, and the claim would be infringed if the structure were designed as specified to allow for such functionality ... the actual act of loading is immaterial to the patented claim." [512] at 14 (emphasis added).

Nothing in the patent, the parties' claim construction, or this Court's or the previous district court's analyses support the conclusion that soup cans are "covered" by the patents. Furthermore, Gamon cites no legal support for the proposition that a patent axiomatically covers everything it touches. Would a patented watch display case "cover" the Rolexes within? Would a patented tablet case "include" the iPad? In

11

short, Gamon's position that its patent claims "cover … the soup cans" is unsupported and therefore unsuccessful. [568] at 8.

Gamon's position also contradicts its own expert's report. In his convoyed sales analysis (discussed on pages 13–18 below), Weinstein explains that the term "convoyed sales" describes the "relationship between the sale of a patented product and a functionally associated *non-patented* product." [539-1] ¶ 63 (emphasis added). Weinstein concludes that there is such a relationship between the patented racks and the *non-patented* cans of soup. *Id.* ¶¶ 64, 68–69. Weinstein's report, then, assumes that the soup cans are non-patented—quite the opposite of the argument Gamon makes here, that the rack's patent includes the cans. This contradiction both cuts away at Gamon's argument and underscores the unreliability of Weinstein's report. *C.f. Baxter Int'l, Inc. v. CareFusion Corp.,* No. 15 C 9986, 2022 WL 952276, at *3 n.1 (N.D. Ill. Mar. 30, 2022) ("This inconsistency in Baxter's position—she did not need to identify an SSPPU, but if she did, it was the entire Alaris system—only underscores the unreliability of Salters' apportionment approach.").

Gamon argues in the alternative that the "[racks] filled with cans is the smallest saleable ***practicing*** unit." [568] at 8 (emphasis in original). Gamon does not support this claim with analysis or citation and does not explain its emphasis of "***practicing***." And again, the record belies this claim: Racks need not be—and indeed, are not—loaded with soup cans when sold to Campbell and shipped to the grocers. *See, e.g.,* [512] at 12.

12

Weinstein notes the above concepts and cites some of the above-cited cases. [539-1] ¶¶ 24–25, 28. But he does not incorporate them into his analysis. Instead, he maintains that, because reasonable royalty damages account for the benefits derived from the use of an infringing product, "[s]oup sales should be included in the royalty base." [539-2] at 131:11-12; *see also id.* at 155:5-11 (soup sales from racks should be included in the base because they "reflect the benefits that Campbell obtains from use made of Gamon's invention"). But in circumventing the SSPPU, Weinstein has failed to apportion the royalty base down to a reasonable estimate of the value of the infringed product—an error that has barred his testimony before. *See Virnetx,* 767 F.3d at 1329 (Weinstein's testimony held inadmissible when he "did not even try to link demand for the accused device to the patented feature, and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products"); *Good Tech. Corp. v. Mobileiron,* No. 5:12-cv-05826-PSG, 2015 WL 4090431, at *5 (N.D. Cal. July 5, 2015) (excluding Weinstein's testimony in part because he "d[id] not sufficiently apportion the royalty base"). This failure constitutes an unreliable application of the principles and methods to the facts and necessitates the exclusion of Weinstein's testimony under Rule 702(d).

### 2. Convoyed Sales

A "convoyed sale" refers to the relationship between the sale of a patented product and a functionally associated non-patented product. *Am. Seating Co. v. USSC Grp., Inc.,* 514 F.3d 1262, 1268 (Fed. Cir. 2008); *accord* [539-1] ¶ 63 ("It is my understanding that a convoyed sale must have a 'relationship between the sale of a

patented product and a functionally associated non-patented product.'"). To show that it is entitled to lost profits for convoyed sales, "a patentee must prove that the unpatented products and the patented product together constitute a 'functional unit,' such that they are analogous to components of a single assembly or parts of a complete machine." *Wash World Inc. v. Belanger Inc.,* 131 F.4th 1360, 1375 (Fed. Cir. 2025) (cleaned up).[5] "If the convoyed sale has a use independent of the patented device, that suggests a non-functional relationship." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.,* 778 F.3d 1365, 1375 (Fed. Cir. 2015), *rev'd on other grounds, Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.,* 577 U.S. 1099 (2016).

For example, a razor handle and blade are completely dependent on each other. So are a printer and its cartridge. These are functional units. *Bioverativ Inc. v. CSL Behring LLC,* No. CV 17-914-RGA, 2020 WL 1047755, at *3 (D. Del. Mar. 4, 2020). On the other hand, take a patented wheelchair tie-down system that is used in a bus, adjacent to unpatented folding bus seats. *See American Seating Co.,* 514 F.3d at 1269. Bus manufacturers typically would buy the tie-down system and folding seats from the same source, as a package deal. *Id.* In *American Seating*, the patent-holder argued that it was entitled to profits from the sale of both its infringed tie-down system *and* the adjacent, but unpatented, folding seats. *Id.* The Federal Circuit concluded otherwise, holding that because the patented tie-down could be used with any other type of folding seat, and because folding seats "command a market value and serve a

---

[5] Where, for example, three of four customers buy a patented car wash with an unpatented dryer, the unpatented dryer would not be considered part of a "functional unit," but merely the type of package deal sold as a "matter of convenience of business advantage." *Wash World Inc. v. Belanger Inc.,* 131 F.4th 1360, 1375–76 (Fed. Cir. 2025).

useful purpose independent of the patented [tie-downs]," the two did not constitute convoyed sales. *Id.* In addition, *American Seating* reached this conclusion despite the fact that the patent "refers to a preferred embodiment in which the tie-down of the invention is located 'adjacent chairs that fold against the side of the bus.'" *Id.*; *see also id.* (noting that "the claims make no mention of the passenger seats and the references to the 'adjacent chairs' do not indicate any functional relation between the seats and the wheelchair tie-downs").

Gamon argues that Weinstein's analysis is proper under the law of convoyed sales. [568] at 9. To support that assertion, Gamon cites Weinstein's analysis that "[u]sing soup sales as the licensed base is reasonable in light of [his] discussion of *Georgia-Pacific* Factor No. 6." [539-1] ¶ 116. That factor concerns: "The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia-Pac.,* 318 F. Supp. at 1120.

In his analysis of the sixth *Georgia-Pacific* factor, Weinstein discusses the rack's purpose in dispensing cans. [539-1] ¶¶ 64–67 (pointing out that Campbell used the racks to merchandise its soup in stores, and that Kroger and Meijer used the racks "for the purpose of displaying soup products"). He concludes that, because "[t]here is no other use for the … racks but to dispense soup products," the racks and the soup "form a functional unit," and "sales of soup products are properly considered convoyed when sold via [racks]." [539-1] ¶ 68.

15

This is not a proper convoyed sales analysis. Nothing in Weinstein's discussion suggests that the racks *require* Campbell's soup cans to function or that the racks and Campbell's soup cans otherwise form a functional unit. At best, Weinstein's analysis supports the point that the racks, when stocked together with Campbell's soup cans, increase Campbell's sales. But products sold together for convenience or business advantage are not considered convoyed sales. *Wash World*, 131 F.4th at 1375. Nor does it matter that the infringing product drives demand for the unpatented product, or even that the infringed product is "valuable, important, or even essential to the use" of the overall product. *Bioverativ Inc.*, No. CV 17-914-RGA, 2020 WL 1047755, at *3 (explaining that the focus of the functional unit test is not on "[w]hether demand for the non-infringing [product] is driven by the patented infringing [product]"). Where products "necessarily function separately from one another"—as is the case with display racks and soup cans—"they are not a 'functional unit' for the purposes of a convoyed sales analysis." *Id. See also Virnetx*, 767 F.3d at 1327.

The Court further questions Weinstein's assertion that "[t]here is no other use for the … racks but to dispense soup products," [539-1] ¶ 68, and Gamon's similar contention that the racks are "designed … to sell soup." [568] at 9. As discussed above on pages 10–11, the patent's claims certainly do not require that the racks be used with "soup products," but allow for the rack's use with a variety of "cylindrical"

16

products. Certainly, the racks could function just the same stocked with cans of vegetables or store-brand soup, or jars of mayonnaise, rather than Campbell's soup.[6]

Both Weinstein and Gamon rely upon a case that does not discuss convoyed sales, *Mosinee Paper Corp. v. James River Corp.* No. 88-c-968, 1992 WL 41690, at *7 (E.D. Wis. Feb. 18, 1992). *Mosinee* is further distinguishable on its facts: There, the plaintiff and defendant *both* sold paper towels and, in an effort to sell more paper towels, *both* provided their customers with free or low-cost paper-towel dispensers. *Id.* at *7. So, when the defendant infringed on the plaintiff's paper towel dispenser patent, the plaintiff lost out not only on profits from the dispensers themselves, but also profits from the paper towels customers would have purchased for use in the dispensers. *Id.* Because Gamon does not sell soup and Campbell does not sell racks, *Mosinee* is inapplicable.

Nor does *Juicy Whip, Inc. v. Orange Bang, Inc.* support Gamon's argument. 382 F.3d 1367, 1372 (Fed. Cir. 2004). Similar to *Mosinee,* the plaintiff in *Juicy Whip* sold both a patented dispenser *and* the unpatented syrup that the dispenser held. *Id.* The plaintiff sought the lost profits from the syrup it would have earned had the defendant not infringed on its dispenser. *Id.* The Federal Circuit further found that the plaintiff's patented dispenser and unpatented syrup shared a functional relationship because the two function together "to produce the visual

---

[6] Gamon acknowledged in earlier briefing that the racks did not *only* display Campbell's soup. Rather, the racks were merely "configured to display" and "have been observed storing and displaying Campbell's brand, Meijer brand, and Kroger brand soups." [575] at 4; [447-10] at 15. This recognition of non-exclusivity is difficult to square with Gamon's argument now that Campbell's soup cans are integral to its patents.

appearance that is central to Juicy Whip's [patent]." *Id.* at 1372. Here, because Gamon does not sell soup, it cannot claim lost profits from soup it would have sold had Campbell not infringed. Nor do Gamon or Weinstein contend that cans of Campbell's soup are central to the racks' "visual appearance."

At bottom, the simplest question to ask when considering whether a patented and unpatented item together form a "functional unit" is whether the unpatented item would be "useless" without the patented one. *See Bioverativ*, No. CV 17-914-RGA, 2020 WL 1047755, at *3; *see also Warsaw Orthopedic,* 778 F.3d at 1375 ("If the convoyed sale has a use independent of the patented device, that suggests a non-functional relationship."). But Gamon does not contend, and Weinstein's analysis does not support, that Campbell's soup cans would be "useless" without the racks or that the racks would be useless without the soup cans. So, there is no role for convoyed sales in a proper damages calculation, leaving Weinstein's calculation inadmissible under Rule 702(b) and (d) (expert's opinion is admissible only if "based on sufficient facts or data" and it "reflects a reliable application of the principles and methods to the facts of the case").

### 3. Entire Market Value Rule

There is one exception to the principles of apportionment: Under the entire market value rule ("EMVR"), a plaintiff can recover damages based on the value of an entire, multi-component product, *if* the plaintiff proves that the patented component is the "basis for customer demand." *Lucent Tech.,* 580 F.3d at 1136; *Pelican Int'l*, 655 F. Supp. 3d at 1043–44 ("Application of the [EMVR] is appropriate

only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts.") (cleaned up).

Weinstein expresses an understanding of this rule but does not incorporate it in his analysis. [539-1] ¶ 25. And Gamon argues that the EMVR does not apply because "cylindrical cans are included in the invention," so "no unpatented component parts are implicated." [568] at 10. The Court already has rejected this contention for the reasons stated above.

Gamon offers an alternative argument: The EMVR is satisfied because Gamon's technical expert, Paul Hatch, opined that "100% of the benefits of the claimed invention are provided by the [rack]." [568] at 10. This, in turn, led Weinstein to conclude that "all incremental value that I have quantified as received by Campbell from [the rack] over the next-best non-infringing alternatives is attributable to each of the Patents-in-Suit." *Id.* (citing [539-1] ¶ 113 n. 187). Even if the Court took these conclusions as true, it could only glean from them that the racks have earned Campbell more money in soup profits. But that does not touch upon the question that the EMVR asks: Are the racks the sole basis of consumer demand for Campbell's soup? Neither Weinstein nor Gamon say. Like convoyed sales, EMVR therefore is not a proper component of a damages calculation here, both because of the manner in which the EMVR was applied and the unsupported factual premise triggering its attempted application. *See* Fed. R. Evid. 702 (expert's opinion is admissible only if "based on sufficient facts or data" and it "reflects a reliable application of the principles and methods to the facts of the case").

### C. Weinstein's "Hypothetical Negotiation" Approach Is Flawed.

As explained earlier, the "hypothetical negotiation" approach applies the *Georgia-Pacific* factors to calculate the royalty the parties would have agreed upon had they negotiated an agreement before the start of the infringement. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.,* 967 F.3d 1353, 1372 (Fed. Cir. 2020). The hypothetical negotiation must "accurately reflect[] the real-world bargaining that occurs." *Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC,* 879 F.3d 1332, 1349 (Fed. Cir. 2018).

In applying the *Georgia-Pacific* factors to the hypothetical negotiation, Weinstein assumes that the parties would bargain over Campbell's soup profits. *See, e.g.,* [539-1] ¶ 113 ("[A] starting point at the hypothetical negotiation would involve apportioning Campbell profits on sales of … soup products down to the incremental profit Campbell obtained through use of [the racks].")"; *id.* ¶ 114 ("At the hypothetical negotiation, the parties would bargain over the total incremental benefits provided by the [racks] to Campbell."). But Weinstein never explains *why* the parties would turn to Campbell's incremental soup profits as a starting point, rather than the much more obvious rack revenue.

And as Campbell points out, soup profits as a starting point is very unlikely given that Campbell and the grocers do not track where the racks are installed, or which purchases were dispensed from racks. [551] at 10; [539-1] ¶¶ 86, 120, 124. It would therefore be impossible to know exactly how much of Campbell's revenue came from soup that once sat in racks. As Gamon admits, the parties' best option would be

20

to use data showing the percentage of store with racks, and to somehow extrapolate how many cans of which types of soup were sold from those racks. [568] at 12. Weinstein does not explain why the parties would base their negotiation on practically unknowable information.

Gamon deems this criticism an "argument[] about the facts" that "is not a *Daubert* argument." [568] at 10. This is not a factual dispute, but a matter of relevancy: To properly aid the jury, an expert's opinion must be tethered to the facts of the case. *Daubert,* 509 U.S. at 591 ("An additional consideration under Rule 702— and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). Otherwise, it must be excluded. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1315–16 (Fed. Cir. 2011) ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded … [O]ne major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case."). It is also a question of methodology, as Weinstein failed to explain what led him to the conclusion that a negotiation over racks would be based on soup profits.

Alternatively, Gamon argues that there is "ample evidence the parties would have considered [Campbell's] sales through the infringing system at the hypothetical negotiation." [568] at 10. But Gamon does not point the Court to where Weinstein analyzes that "ample evidence" in his report. Instead, Gamon claims that both it and Campbell were aware, at the time of the hypothetical negotiation, of the racks' impact

21

on soup sales. [568] at 10. Even taking this as true, Gamon does not explain why the parties' awareness of the racks' impact would then lead them to negotiate on soup profits as a clear "starting point." Gamon's argument does not mend Weinstein's failure to tie his analysis and findings to the facts of the case, in violation of Rule 702(d).

\* \* \*

In short, the Court concludes that Weinstein's damages opinions are inadmissible under Rule 702. As detailed above, his overall opinions do not reflect a reliable application of the established principles and methods to the facts of the case and, in certain additional regards, his opinions are not based on sufficient facts or data and are not the product of reliable principles and methods.[7]

Separately, Weinstein's inflated damages calculation also risks unfairly prejudicing and misleading the jury in contravention of Federal Rule of Evidence 403. *See Elbit,* 927 F.3d at 1302 (cautioning that a royalty base that is not "suitably limited" may result in "a prejudicial effect on a jury determination"); *Ericsson,* 773 F.3d at 1226 (counseling that "care must be taken to avoid misleading the jury" when a multi-component product is at issue and "the patented feature is not the item which imbues the combination of the other features with value"); *accord Realtime Data,* No. 6:17-CV-00084-JDL, 2018 WL 6266301, at *4. The choice of royalty base makes an incredible difference in each side's damages calculations, which makes the Court

---

[7] Campbell offers additional critiques of Weinstein's opinions that flow from Weinstein's selection of soup sales as the royalty base for his damages calculation. [551] at 11–19. Because the Court has concluded that Weinstein's choice of royalty base is flawed, and excludes Weinstein's opinions on that basis, it does not to address these other arguments.

particularly wary of placing Weinstein's overstated figure in front of a group of laypersons. By using soup sales as his royalty base, Weinstein concludes that defendant Campbell alone would owe Gamon either $188.2 million or $143.7 million. By comparison, Campbell's expert, Trexler, uses display rack revenue as the royalty base in her damages calculations, and concludes that following a hypothetical negotiation, Campbell would agree to pay a royalty no more than $7.8 million. [531-3] ¶ 12. Once the $188 million "cat" is out of the bag and before the jury, it can "never [be] put back into the bag": Such a huge number "cannot help but skew the damages horizon for the jury." *Uniloc,* 632 F.3d at 1320.

Finally, in barring Weinstein's testimony, this Court notes that it joins other courts that have deemed Weinstein's testimony on reasonable royalties unfit for trial for similar reasons. *See, e.g.*, *Virnetx*, 767 F.3d at 1325–29; *Chr. Hansen HMO GmBH v. Glycosyn LLC*, No. 22-cv-11090-NMG, 2025 WL 2176942 (D. Mass. Mar. 31, 2025); *Good Tech. Corp.,* No. 5:12-cv-05826-PSG, 2015 WL 4090431, at *5. Campbell's motion to exclude Weinstein's testimony [535] is granted.

### III.   Gamon's Motion to Partially Exclude Trexler's Testimony

Gamon's motion to exclude Campbell's damages expert, Dana Trexler, starts off as essentially the inverse of Campbell's motion to exclude Gamon: It argues Trexler's opinions must be excluded because she expressly omits soup sales from her reasonable royalty calculation. *See generally* [547]. But in its reply, Gamon clarifies that it only seeks to exclude five of Trexler's opinions: (1) that soup cans are not part of the patented invention, (2) that soup sales should not be considered in assessing

damages, (3) that soup cans are not, when paired with the racks, convoyed sales, (4) that the "Siffron agreement" may be considered, and (5) that Weinstein's opinion is contradicted by the concept of patent exhaustion. [575] at 1.

The Court considers—and rejects—each of these arguments in turn.

### (1), (2): Trexler's exclusion of soup sales from the reasonable royalty

Gamon repeatedly criticizes Trexler for opining that soup is not part of the patented invention. *See, e.g.,* [547] at 6 (arguing that soup cans "form part of the claimed invention."); *id.* at 7 (arguing that Trexler improperly opines "that soup cans are not part of the invention."). Gamon does not meaningfully distinguish this criticism from its second argument that Trexler failed to take the racks' "use" into account when assessing damages. *Id.* at 7, 8. For the reasons explained in the Court's exclusion of Weinstein's report and testimony on pages 10–12, soup cans are not included by the patents' claims. The Court will therefore not exclude Trexler's testimony that soup cans are not part of the invention. *See* [547] at 7.[8]

Of particular note, Gamon largely relies upon *University of Pittsburgh of Commonwealth System of Higher Education v. Varian Medical Systems, Inc.,* to argue that Trexler's failure to consider soup sales in the royalty base is improper. 561 F. App'x 934 (Fed. Cir. 2014). [547] at 5; *id.* at 8. Gamon cites *Varian* for the contention that, where a patent's claim language explicitly includes a feature as a claimed

---

[8] Gamon cites two other cases in support of the inclusion of Campbell's soup cans in the royalty rate. *See* [547] at 8–9 (citing *Realtime Data, LLC v. Oracle Am., Inc.,* C.A. No. 6:16-CV-00088-RWS-JDL, 2017 WL 11574028, at *6 (E.D. Tex. Mar. 30, 2017) and *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 76 F. Supp. 3d 806, 818 (W.D. Wis. 2014)). Both cases stand for the proposition that features asserted in the patent claims must figure into the damages analysis. As the Court has already discussed, this concept is inapplicable because the patents do not claim Campbell's soup.

component of a patented apparatus, then that feature should be incorporated into the royalty base. [547] at 5.

Campbell points out that *Varian* is not precedential. The Court agrees: Not only are unpublished Federal Circuit cases not binding, Fed. Cir. R. 32.1(d), but in *Varian,* the Federal Circuit specifically "emphasize[d] the fact- and record-specific nature of its holding." *Id.* at 950. Even leaving those concerns behind, *Varian* still does not help Gamon. In Gamon's own words, *Varian* allows that, if a patent's claim language explicitly includes an unpatented feature, then that feature should be included in the royalty base. [547] at 5; [575] at 3 ("In *Varian,* the court found it improper to fail to consider a portion of the invention … in the damages analysis."). But as the Court discussed in its analysis of Weinstein's report, the patents' claim language here does *not* explicitly include Campbell's soup cans. *See supra,* at 10–12. The soup cans are therefore not "a portion of the invention." *Contra Varian*, 561 F. App'x at 947 (noting that "Claim 38 … explicitly includes the beam generator as a claimed component of the apparatus" before going on to quote the precise language from the patent supporting that point). Gamon's reliance on *Varian,* then, is inapt.[9]

Nor is the Court troubled by Trexler's opinion that "soup cans are neither a component of the accused racks' assembly nor a part of the complete rack[.]" [531-3] ¶ 256; *see also id.* at 352 ("The Asserted Patents claim the design of gravity feed racks, not soup or soup cans."). For the reasons explained *supra* pages 10–12, Trexler's

___

[9] Gamon also cites *Varian* for the contention that a reasonable royalty must be based on the infringer's use of the invention. [547] at 8; [568] at 7. Per Gamon's own interpretation (and the Court's read of the case), *Varian* did not discuss a use-based royalty rate.

opinion does not contradict either the patents' claims or the Court's interpretation of the same. Indeed, as the Court wrote in its earlier summary-judgment order: the patents' claims "recite a display rack structure that allows for certain functionality" and "the actual act of loading is immaterial to the patented claim." [512] at 14.

Trexler's opinion that a reasonable royalty should be based on rack sales is relevant and supported by proper methodology. The Court will not belabor this point, as Gamon clarified that it does "not seek to exclude underlying facts related to damages." [575] at 5. But, applying the *Georgia-Pacific* factors, Trexler thoroughly analyzes the racks' impact on Campbell's soup sales. [531-3] ¶¶ 61–68, 187–91, 294–302, 354–72, 428–29. She examines Campbell's previous agreements with Gamon and Trinity to purchase racks on a per-rack payment, unattached to soup sales, *id.* ¶¶ 29–44, and Gamon's tentative offer to sell Campbell its patent portfolio, awarding Campbell the right to produce the racks for 10% of the cost. *Id.* ¶¶ 172–94. She weighs the racks' initially positive sales impact against their subsequent decline in popularity and adverse sales impact. *Id.* ¶¶ 122–27, 191, 263, 126, 278, 354. She also recognizes the practical impossibility of a soup sales-based royalty structure, given Campbell's and the grocers' inability to track rack-based soup sales. *Id.* ¶¶ 93–98.

Of course, it is plausible that soup sales may be relevant to the parties' hypothetical negotiation and resulting reasonable royalty rate, just as lumber and hinges were relevant to the saw guards' reasonable royalty in *Powell*. 663 F.3d at 1239–40. Trexler does not dispute this concept. Instead, she analyzes the facts of the case and reasons that, because Campbell and the grocers "are unable to reasonably

quantify" the racks' impact on soup sales, any reliance on soup profits would be "speculative and unreliable," and "based on a false assumption that … any party, would negotiate and pay royalties based on an unquantifiable amount." [351-3] ¶ 353; *see also id.* ¶ 367 (because "the available information does not establish a single, consensus rate of increase" in soup sales resulting from rack use, Campbell "would be unwilling to negotiate a reasonable royalty rate based on a lift in soup sales."); *id.* ¶ 403 (listing reasons that the defendants would not agree to consider soup sales in the hypothetical negotiation).

That is all to say: the Court is satisfied that Trexler's opinion is "consistent with the realities of a hypothetical negotiation" and reflects "real-world bargaining." *Exmark Mfg.,* 879 F.3d at 1349. It therefore passes muster under Rule 702 and *Daubert.* As Gamon acknowledges, its criticism of Trexler's factual considerations and exclusion of soup sales is appropriate for cross-examination (subject to any additional *in limine* rulings the Court may make that bear on the scope of that cross-examination). [575] at 5–7 (criticism of Trexler's factual basis); *id.* at 7 ("Regardless, Plaintiffs agree that factual disputes between the experts … are issues for cross examination and not exclusion.").

### (3) Convoyed Sales

Gamon criticizes Trexler's opinion that soup cannot be considered a convoyed sale. [547] at 10. For the reasons stated above on pages 13–18, the Court rejects this argument.

### *(4) Siffron Agreement*

Gamon criticizes Trexler's consideration of a 2021 license agreement between Gamon and third-party Siffron (the "Siffron agreement"). [547] at 10. Trexler opines that the Siffron agreement "provides guidance" that the racks' royalty structure should be a running royalty percentage of the rack's price. [531-3] ¶ 225. She further deems the Siffron agreement "informative to the hypothetical negotiation," as it "provide[s] a reasonableness check" of what should constitute a reasonable royalty rate. *Id.*

As Gamon points out, this 2021 agreement came seven years after the parties' 2014 hypothetical negotiation date. [547] at 10. Gamon argues that its economic circumstances in 2014, when the hypothetical negotiation would have been executed, were "completely different" than its much weaker 2021 position. *Id.* at 11–12. Gamon also points out that its founder died in 2021, leaving the business to his son, who had a different full-time job. *Id.* at 13. Furthermore, the Siffron agreement concerns different patents and technology than are at issue in this litigation. *Id.* at 11. Gamon points out that these patents were "completely unproven" and unestablished in the marketplace, in contrast to the racks' years of success. *Id.* at 12. The negotiating parties are different, as well: Siffron is Gamon's competitor, while Campbell and Trinity are Gamon's customers. *Id.* at 13. In short, Gamon argues, Trexler ignored the distinctions in "time, economic circumstances, patents and technology, and market positioning" that render the Siffron agreement and the hypothetical

28

negotiation incomparable and inadmissible under Federal Rules of Evidence 403 and 702. *Id.*

The Court disagrees with Gamon's characterization that Trexler "ignored" these differences. In her report, Trexler addresses the differences between the Siffron products and the racks, [531-3] ¶¶ 204–11; compares the way the two were advertised and their market positions, *id.* ¶¶ 214–15, 219–20; discusses the competitive relationship between Siffron and Gamon, *id.* ¶ 218; criticizes Weinstein's attempt to distinguish the Siffron agreement from the hypothetical negotiation, *id.* ¶ 224; and summarizes why, despite the noted differences, "the Siffron agreement provides guidance as to the royalty structure." *Id.* ¶ 225.Furthermore, addressing Gamon's argument would require the Court to answer factual questions. For example: Were the Siffron racks really so similar to the infringed racks? Where the Siffron racks even market worthy? What was going on with Gamon's financials and its negotiation power in 2021, as compared to 2014? These types of factual questions are best addressed by cross examination and answered by the jury, rather than excluded altogether. *Virnetx,* 767 F.3d at 1328 ("[Q]uestions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury."); *see also i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 854 (Fed. Cir. 2010) (the "quarrel with the facts [Trexler] used go[es] to the weight, not admissibility, of h[er] opinion").

Nor does Trexler's analysis of the Siffron agreement violate Rule 403. [547] at 13. Trexler opines that the agreement is relevant as a "guideline" or "reasonableness check" for her hypothetical negotiation. [531-3] ¶ 225; *id.* ¶ 456 (considering the

Siffron agreement's royalty rate and concluding that her royalty rate, by comparison, "is reasonable"). As Trexler explains, "[d]amages experts often perform a reasonableness check of their damages amount to ensure that the estimated damages align with other available information and are within a reasonable degree of professional certainty." *Id.* ¶ 389. Here, the Siffron agreement aligns with Trexler's proposed royalty structure and reasonable royalty rate. *Id.* Gamon disputes that Trexler only uses the Siffron agreement as a "reasonableness check," arguing instead that she "treats the royalty rate … as directly bearing upon the hypothetical negotiation here." [575] at 8. But to support this point, Gamon only quotes a portion of Trexler's opinion where she compares the Siffron royalty rate to her own and finds the latter "reasonable." *Id.* (quoting [531-1] ¶ 456). And in any event, Gamon is free to cross-examine Trexler regarding the difference in circumstances between the Siffron agreement and the hypothetical negotiation. The risk that Trexler's discussion of the Siffron agreement might mislead the jury does not substantially outweigh the relevance of the agreement as a "reasonableness check" of her hypothetical negotiation opinion.

Finally, Gamon cites *ResQNet.com, Inc. v. Lansa, Inc.,* contending that noncomparable licenses cannot be used in determining a royalty rate. 594 F.3d 860, 870 (Fed. Cir. 2010); [575] at 8. In *ResQNet,* the expert "used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." 594 F.3d at 870. None of the licenses "showed any … discernable link to the claimed technology." *Id.* The expert's use of the noncomparable, high-

royalty-rate licenses led the Federal Circuit to the "inescapable conclusion" that the expert used these unrelated licenses "to push the royalty up into double figures." *Id.*

But Gamon does not argue that there is so significant a divide between the Siffron agreement and the hypothetical negotiation that the Court can only be led to the "inescapable conclusion" that Trexler is attempting to push down the royalty rates. Instead, it points to factual disputes that, as determined above, are best left for cross examination.

### (5) Patent Exhaustion

Finally, Gamon criticizes Trexler as unqualified to opine on patent exhaustion, as it is a "legal issue outside her expertise." [547] at 14. Gamon also argues that, despite opining that "patent exhaustion" bars recovery from Kroger and Meijer, Trexler "admits that she has no understanding whether a limited license between Gamon and Campbell would exhaust Gamon's rights to seek additional damages for additional benefits enjoyed by the retailers Kroger/Meijer." *Id*. According to Gamon, because Kroger and Meijer obtain an additional and separate benefit from Campbell, the damages are not subject to patent exhaustion. *Id.* at 15.

Trexler's only discussion of patent exhaustion is her criticism that Weinstein's report "[i]gnores the concept of patent exhaustion and its application to the parties involved in the hypothetical negotiation." [531-3] ¶ 84. Because the Court excluded Weinstein's report and testimony from trial, it need not determine whether Trexler's criticism of the same is admissible.

\* \* \*

For the reasons stated above, Trexler's opinion passes muster under *Daubert* and Rule 702. Gamon's motion to partially exclude it [531] is denied.

## IV.    Conclusion

For the reasons stated below, the Court grants Campbell's motion to exclude the opinions of Roy Weinstein [535] and denies Gamon's motion to partially exclude the opinions of Dana Trexler [531].

ENTER:

Georgia N. Alexakis
United States District Judge

Date: September 4, 2025

32