**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMON PLUS, INC. and GAMON INTERNATIONAL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE CAMPBELL'S COMPANY f/k/a CAMPBELL'S SOUP COMPANY, MEIJER, INC., THE KROGER CO., and TRINITY MANUFACTURING, L.LC.,<br><br>Defendants. | Case No. 15-cv-8940<br><br>Judge Georgia N. Alexakis<br><br>JURY TRIAL DEMANDED |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO REMEDY**

## TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. LEGAL STANDARDS .......... 2

A. Judgment As A Matter Of Law .......... 2

B. Patent Damages .......... 2

III. ARGUMENT .......... 3

A. There Was Sufficient Evidence For The Jury To Apportion .......... 3

1. The Jury Could Reasonably Have Determined the Full Value of the Infringing Racks Was Due to the Patents .......... 3

2. None of the Prior Art Could Achieve the Benefits of the Invention .......... 5

3. Gamon Presented Evidence Directly Tracking *Transworld* .......... 6

4. The Jury's Verdict is Also Consistent with a Gamon License and License Offer, Which Reflect Built-In Apportionment .......... 8

5. The Jury Could Apportion Based on the Next-Best Alternative .......... 12

6. Gamon Also Addressed Every *Georgia-Pacific* Factor .......... 13

a. GP 10, 11 – Benefits and Value of Use to Infringer. .......... 13

b. GP 1, 2, 12 – Licensing Factors .......... 14

c. GP 3, 7 – Scope & Duration of the License .......... 14

d. GP 4, 5 – Plaintiff's Licensing Policy; Party Relationship .......... 14

e. GP 6, 8 – Effect of Patented Invention On Sale of Other Products, Commercial Success, Profitability .......... 14

f. GP 9, 13 – Advantages Over Prior Art, Apportionment .......... 15

7. There Is No Requirement that Apportionment Can Only Be Done By A Damages Expert or that A Precise Number is Required .......... 16

a. The Court Ruled Multiple Times That Under Federal Circuit Law, Damages Can Be Presented Without an Expert .......... 16

b. Plaintiff Was Not Required To Present the Jury With Numerical Exactitude as to Apportionment ........ 17

B. Defendants' Other Damages Arguments Are Unsupported and Incorrect ........ 18

1. The Jury Had More Than Sufficient Information With Which To Determine a Reasonable Royalty ........ 18

2. The Jury's Damages Amount Need Not Have Been Explicitly Proposed By Either Party ........ 20

IV. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Hospira Inc.*,
944 F.3d 1327 (Fed. Cir. 2019)....................2

*Apple v. Motorola*,
757 F.3d 1286 (Fed. Cir. 2014)....................2, 12

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021)....................20

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................10, 12

*Devex Corp. v. Gen. Motors Corp.*,
667 F.2d 347 (3d Cir. 1981)....................20

*Dow Chem. Co. v. Mee Indus., Inc.*,
341 F.3d 1370 (Fed. Cir. 2003)....................1

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys.*,
LLC, 927 F.3d 1292 (Fed. Cir. 2019)....................10, 12

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)....................11

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)....................13, 17

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)....................18

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
394 F.3d 1368 (Fed. Cir. 2005)....................2, 20

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed.Cir.1983)....................19

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)....................2

*Jones v. W. & S. Life Ins. Co.*,
91 F.3d 1032 (7th Cir. 1996) ....................2

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................19, 20

*Magnuson v. Trulity Glass and Aluminum Sols. LLC*,
2025 WL 2556258 (7th Cir. 2025) ....................17

*Mathur v. Bd. of Trustees of S. Ill. Univ.*,
207 F.3d 938 (7th Cir. 2000) ....................2

*Omega Patents LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021)....................17

*Outboard Marine Corp. v. Babcock Indus. Inc.*,
106 F.3d 182 (7th Cir. 1997) (Posner, J) ....................8

*Powell v. Home Depot, U.S.A., Inc.*,
663 F.3d 1221 (Fed. Cir. 2011)....................13

*Reeves v. Sanderson Plumbing Prods.*,
530 U.S. 133 (2000)....................2

*Schandelmeier-Bartels v. Chi. Park Dist.*,
634 F.3d 372 (7th Cir. 2011) ....................2

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir.2015)....................20

*TC Tech. LLC v. Sprint Corp.*,
2019 WL 2515779 (D. Del. June 18, 2019) (Andrews, J.)....................13

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
633 F. Supp. 1047 (D. Del. 1986)....................7

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
750 F.2d 1552 (Fed. Cir. 1984)....................6, 7, 8, 18

*Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*,
69 F.3d 512 (Fed.Cir.1995)....................20

*Vectura Ltd. v. Glaxosmithkline LLC*,
981 F.3d 1030 (Fed. Cir. 2020)....................9, 10, 11, 12

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)....................17, 19

## I. INTRODUCTION

Defendants' argument that the jury lacked legally sufficient evidence to determine damages that apportion the value of the patented invention is wrong and ignores the trial record.

Gamon presented extensive evidence allowing the jury to identify the value of the patented invention. This included technical apportionment testimony from Mr. Hatch that the claims cover the complete infringing racks and account for all their benefits, and extensive testimony from Mr. Johansen, Mr. Hatch, and Defendants' own witnesses regarding how the invention improved over the prior art. It also included evidence that the patent claims are responsible for the large door and its billboard effect (the feature Defendants focus on in their motion). Gamon also presented extensive evidence of market valuations of the patented technology, including Gamon's pricing and profits for the patented racks, licensing offers and licenses that Defendants' own expert testified were comparable and relied on, and the value of the patents over the next-best alternative to infringement (traditional shelving). The Federal Circuit endorses using each of these types of evidence for damages and apportionment, each of which are independently sufficient.

Defendants' motion ultimately boils down to the argument that because the Court excluded Gamon's damages expert there could not possibly have been a valid damages award. That is not the law. As this Court (and Defendants themselves) recognized in pretrial proceedings, juries can award damages based on non-expert evidence. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). Moreover, Defendants' own expert testified and acknowledged that damages from Defendants' infringement are calculable (and gave a nonzero amount). Likewise, the fact the jury awarded a number in between what Defendants proposed and the evidence that Gamon introduced, as juries do in many cases, does not mean damages were "speculative." The Federal Circuit has repeatedly held that it is appropriate for juries to do so.

## II. LEGAL STANDARDS

### A. Judgment As A Matter Of Law

A trial court cannot grant judgment as a matter of law unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50. A trial court "does not make credibility determinations or weigh the evidence" *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011), and must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). JMOL "is proper only if reasonable persons could not find that the evidence could support a decision for a party … viewing the evidence in the light most favorable to the [nonmovant]." *Jones v. W. & S. Life Ins. Co.*, 91 F.3d 1032, 1036 (7th Cir. 1996); *Mathur v. Bd. of Trustees of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000) (grant JMOL only if "no rational jury could have found for [nonmovant].").

### B. Patent Damages

In patent cases, the Court cannot award a "zero royalty" if any facts support a reasonable royalty. *Apple v. Motorola*, 757 F.3d 1286, 1328 (Fed. Cir. 2014). "Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). Importantly, "the jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate." *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (aff'g denial of JMOL on damages) (citing *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed.Cir.1995) ("[A] jury's [royalty] choice simply must be within the range encompassed by the record as a whole.")); *Amgen Inc. v. Hospira Inc.*, 944 F.3d 1327, 1341 (Fed. Cir. 2019) (aff'g denial of damages JMOL and noting "[i]t was not unreasonable for the jury to choose a damages award within the amounts proposed" by each party).

## III. ARGUMENT

### A. There Was Sufficient Evidence For The Jury To Apportion

#### 1. The Jury Could Reasonably Have Determined the Full Value of the Infringing Racks Was Due to the Patents

Defendants' premise that there were unpatented features of the infringing racks is not supported by the trial record. Gamon presented extensive evidence from which the jury could find that the full benefit of the infringing racks was due to the claimed design. The jury was entitled to credit this evidence and determine that the only apportionment needed was to isolate the value of the infringing racks themselves. And, as discussed further below, even if additional apportionment was required, the jury had evidence to perform such apportionment.

Plaintiff's technical expert Mr. Hatch walked through exemplary asserted claims element-by-element and showed that they covered each aspect of the infringing racks (Final Trial Tr. ("Tr.") p. 511-19, Shah Dec. Ex. 1); '111 patent claims 17-19, JTX-1). He then testified that the specific **combination** of patented elements (not any unpatented features) delivers the inventive benefits:

> Q. And can you tell the jury what benefits you found stem from the patented invention? A. there is an improved customer experience that comes through from the ideas and the way the invention has been designed. We have reduced labor costs and an easy-to-return product. And in **looking at these overall**, these aim towards increased soup sales of the product itself. (Tr. 520:14-21) …
>
> A. So regarding the customer experience, **the design elements come together** to improve that whole experience. So in particular, **it's the combination of the door that is extra large to cover the two chutes**, the **chutes the way that they're feeding the product towards the front** making it readily available, the **offset set stop structures** that we saw that create that dispensing area where it's very easy to take the next can. It's always the very next can instead of the random can on the shelf. So it's hitting the **combination of these elements**, and their proportions and locations make for this really good design that concurs a lot of those experience issues that I mentioned. Tr. 522:16-523:3 (emphasis added).

The only alleged unpatented feature that Defendants identify is the doors/door cards. However, the claims expressly cover the door, so it is not unpatented. For example, claim 17 of

the '111 patent includes the element "a door supported for movement between a substantially vertical closed position wherein said door covers the product loading openings of both of the chutes and an open position wherein the door does not cover the product loading openings… said door in said closed position having a forwardly disposed face capable of holding a product label or advertising." Claim 2 of the '326 Patent includes similar language.

Inventor Mr. Johanson testified that Gamon's patented design is what creates the large door and its billboard effect enabling this advertising benefit. Tr. 373:3-8 ("A. So our door has got these two chutes. And because it's got two chutes, you get a double size door … more than two times the size of the can's surface. So you end up creating a large advertisement, a large billboard for Campbell's Soup and advertising which product that you're looking for."). Mr. Hatch likewise opined that based on his analysis the large door feature was attributable to the asserted claims. Tr. 539:11-15 ("The particular design that is in the claims that provides the unique benefit of this door and the benefits and, of course, in relation to the other parts; so the fact that it is large and it enables a graphic to be placed upon it, is an example as part of that."), 556:2-4 ("The door that's described by the claims is at least twice as large as the product. So it's certainly relatively tall and wide."), 556:7-9 ("They do describe how the door would be more than twice the size of the product because of the way it describes the door covering the two chutes").[1]

Trinity's witness Mr. Riley also admitted that Gamon's entire design was unique. Tr. p. 717:20-22 ("The whole thing was unique. Q. The combination of everything was unique? A. The combination of everything."). There was also extensive evidence that Defendants added no unpatented features to Gamon's design. To the contrary, Mr. Riley conceded that Trinity copied

[1] Terry Johnson's testimony concerning "color coding" relates to a different issue. Mr. Johnson was discussing "color coding on the racks to group soups into particular categories." Dkt. 711-5 at 3. There was no testimony that the Trinity/Campbell racks (which were all black, Tr. 711:7-10) used such color coding, or even that the door cards in the infringing racks did so.

Gamon's design based upon samples and photos that Campbell sent them. Tr. p. 707:10-12 ("Q. You were sent samples of the IQ Maximizer by Campbell's, correct? A. Correct."); JTX-74, Ex. 2. ("Size – Photos of unit are attached. A sample of the current unit will be shipped."); p. 708:9-12 ("Q. And in terms of innovation, the infringing system, you have no patents and filed no patent applications on it, correct? A. Correct."). The evidence also showed Campbell tried and failed to develop a replacement for Gamon's design (the so called "Maximizer 3.0"), requiring Defendants to instead continue to use Gamon's patented design. Bray Depo, Dkt. 692 ("Q. Did Campbell's ever implement the Maximizer 3.0, I think that is what they call it? A. No. Q. Why not? A. According to my research, it basically never worked.").

At most, Defendants' motion establishes that they attempted to raise a factual dispute about whether the door is patented or unpatented. But at JMOL, it is not sufficient to show merely that something was disputed or that the jury could theoretically have decided differently. The test is whether there is evidence to support the verdict, and here there clearly is.

### 2. None of the Prior Art Could Achieve the Benefits of the Invention

Gamon also presented evidence that the prior art was unable to achieve the benefits of the asserted patents, reinforcing that all benefits were attributable to the asserted claims. Mr. Johanson testified that the MinuteMaid design would not have worked for Campbell's and could not provide the same benefits as those of the Maximizer racks:

> Q. What do we have on the screen here? A. This is a rack that we made for Minute Maid. It was nice, but it didn't work for Campbell's. Tr. 368:9-11.
>
> Q. What were those flaws [in the MinuteMaid system]? A. So it wasn't a true dual chute system … putting the cans in, they simply with not go through, because the can is different than a Welch's frozen orange juice, you know, can is. Well, it's not really a can, but … we had to ditch that design. We had to go to a dual chute design. And the dual chute even allowed us to have that oversized billboard. It also eventually allowed us to have the put-back.
>
> In comparison to Minute Maid, this unit has straight rails where the Minute Maid

> had stair-stepped rails. So it would go and then step down -- sorry -- and step down. That didn't work. That would jostle the can and it would come off the rails. It wouldn't work. Tr. 369:22-370:13.
>
> Q. What was the second solution? A. So as I was saying, these rails are generally straight. In the Minute Maid rack, it would go a step down. And when the can would hit that step down, it would jostle, and it would get -- end up getting locked up. And then you'd have cans stuck up here when it was empty down. Tr. 372:13-19
>
> Q. What was the third part of the solution? A. The third part was this back area here (indicating). So in the Minute Maid, it wasn't a curve, it was straight. And that was an area that we were creating lockups on. So this upward curve in the back was important to help prevent -- to help the cans move smoothly. Tr. 372:20-372:25

Mr. Hatch confirmed that "combining the Minute Maid rack that we saw and the prior art references, especially the Eveready dispenser, these are missing key elements." Tr. 1245:3-5, 1258:15-18 ("If we look to the Eveready to learn about a door, we see that it teaches away from having a door. In fact, it even says, 'no door is necessary.'"), 1260:19-1261:11 (lacks respective loading and dispensing area); 1261:24-25 (did not include patented chutes); 1262:15-16 ("it does not teach the putback feature of the patents.").

### 3. Gamon Presented Evidence Directly Tracking *Transworld*

As discussed above, there was extensive evidence in the trial record that the claims account for the full benefit of the infringing racks. The jury was presented with evidence to isolate the value of the infringing racks themselves, including based on Gamon's real-world pricing and profit for the patented racks, and Trinity's revenue. The Federal Circuit and subsequent remand in *Trans-World* confirm this is a proper basis for determining apportioned damages.

In *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1555 (Fed. Cir. 1984), the patents-in-suit covered "point-of-purchase display racks" used to sell eyeglasses. Trans-World originally designed these racks for Nyman, and obtained patents on the design. *Id*. at 1555. Nyman then (exactly as Campbell's) "found the prices too high and arranged for other companies to manufacture the displays that Trans-World had developed." *Id*. Trans-World sued for patent

infringement. The trial court originally excluded evidence of the effect of the patented displays on increased sales of eyeglasses. The Federal Circuit reversed and found this evidence relevant to a reasonable royalty, and remanded for a new determination of damages. *Id.* at 1568.

On remand, the District Court awarded a reasonable royalty based on the price that "Nyman would have paid Trans-World . . . to manufacture the displays" and the profit Trans-World "would have realized" on such sales. *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 633 F. Supp. 1047, 1056 (D. Del. 1986). Specifically, it determined Trans-World "would have realized a profit of $20.70" per display had it manufactured the displays for Nyman. *Id.* The District Court multiplied this amount by the number of infringing units to compute a royalty. *Id.* at 1057.

Gamon presented evidence allowing the jury to calculate damages using the *Trans-World* approach. That included evidence of Gamon's iQ Maximizer price and profit per unit: $95 and $63.87 respectively. PTX-77, Ex. 3 at 1 ("Sell Price" and "Profit"), Johansen Tr. 380:20-381:23. And evidence of Trinity's total sales revenue: $30.7M (Trexler Tr. 907:4-7, 924:23-25, DTX-118, PTX-280, Ex. 4). Applying the *Trans-World* approach is consistent with the jury's verdict. For example, multiplying Gamon's $63 per unit profit by Trinity's U.S. sales to Campbell's (at least 312,128 sold to Campbell, DTX-118) yields $19.7 million.[2] This is close to and consistent with the jury's award. The jury heard evidence on all *Georgia-Pacific* factors (as discussed below) that permitted it to make adjustments and reach its final royalty. This included evidence pointing either direction – for example, evidence reflecting the value to Campbell from sales lift (*see* evidence *infra*), and Defendants' arguments that the racks became less valuable over time (Tr. 913:17-19).

There is no requirement at JMOL to discern exactly what methodology the jury used or to

[2] The jury also heard other evidence that supports similar results, including documentation of a 46% margin (Tr. 1071:18-23), and an intracompany license agreement with a 50% royalty rate. PTX-17, Ex. 5 at 3; Tr. 406:2-9.

find that it actually used the *Trans-World* approach. *Outboard Marine Corp. v. Babcock Indus. Inc.*, 106 F.3d 182, 186 (7th Cir. 1997) (Posner, J) ("The law neither requires juries to state reasons for their verdicts nor permits courts to inquire into the reasoning process of the jurors for the purpose of impeaching their verdict.") (aff'g damages award in between parties' positions). Post-trial, "the verdict is evaluated against the evidence" and "[i]t is enough (this is implicit in the bottom-line test) that a rational jury could have come to such a verdict." *Id*. Here, a rational jury clearly could have applied the *Trans-World* approach to the evidence to reach the verdict it did.

**4. The Jury's Verdict is Also Consistent with a Gamon License and License Offer, Which Reflect Built-In Apportionment**

The jury was also presented evidence of a licensing offer and an executed license that provided a separate and independent basis for apportionment, even if the racks include unpatented features. For example, the jury heard evidence that in 2007, Gamon offered to license the patents to Campbell's "for between 20 and $24 million as a lump sum payment." Tr. 385:16-20 (Johansen); JTX-63, Dkt. 716-11 (2007 letter to Campbell's); Tr. 387:1-7 ("Q. And how did the 20 to $24 million, how was that calculated based on the document? A. So my dad calculated how much he thought it was going to cost Campbell's to run the IQ Maximizer program. And he calculated it over the life of our patent. And he calculated that between 200 and $240 million. And he took 10 percent of that, 20 to $24 million lump sum payment.").

The jury also had evidence that in 2021, Gamon entered a license agreement with Siffron for the sale of Gamon patents for gravity feed racks used to sell beverages (Cascade). (DTX-106, Dkt. 716-12). The terms included a 1-6% sales royalty rate per year (Trexler Tr. 921:12-18, DTX-106 p. 2, 4, Ex. C). The selling price of a Cascade rack was $1111.10 (JTX-83, Ex. 6 at 14), meaning that a 1-6% royalty equates to a range of $11 to $66 per unit. Tr. 945:21-24 (Trexler) ("6 percent on $1,111, that's $66 per unit, correct? A. Yes.")

Both the 2007 offer and 2021 Siffron license are consistent with the jury award. The 2007 lump sum offer of $20-24M is close to the jury's $17.4M award. The Siffron License similarly computes to a value of about $23.7M at a $66 per unit royalty. Tr. 946:8-22 (Trexler) ("You get about $23.7 million"). Again, the jury had evidence from which it could properly have adjusted these sums. For example, Mr. Johanson testified that by 2014-15, the asserted patents had issued and there had been many more years of sales lift through use of the Racks than in 2007:

> Q. What was the impact on Gamon's thinking of the grant of the patents-in-suit in this case in 2014 and 2015? A. It drastically changed our negotiating leverage with Campbell's. The patents-in-suit what make it illegal for Campbell's to produce the IQ Maximizer. … Tr. 387:17-21.
>
> Q. Sure. Was the data on IQ Maximizer performance the same in 2007 versus 2015? A. No. So in 2007 we knew that we had, you know, multiple years of sales growth. In 2015 – but we had no guarantee that that sales growth was going to continue all the way out to 2015. I mean, it's now 2025 and we've got an in-store promotion that's lasted over 20 years. They're still in store today. That is extremely rare in our industry. Tr. 388:4-12

As for the 2021 Siffron License, Gamon's situation had changed negatively after the passing of its founder Terry Johnson:

> Q. Would the agreement that was entered into in 2021 for the Cascade after your father had passed, would that be what Gamon would have agreed to in 2014 and 2015 when it initiated this lawsuit against Campbell's? A. Absolutely not. Cascade wasn't complete. Siffron had to do additional work to complete it. My father was not alive to complete that work. In 2015 [my father] was alive, he could have completed that work. And it was always his interest to not license. It was his interest and our interest to manufacture. Tr. p. 403:9-21.

Conversely, the Defendants argued these license amounts would be adjusted downwards. Tr. pp. 908:9-924:5 (Trexler).

The Federal Circuit holds that "when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). That is because a damages theory based on a comparable license (or a comparable negotiation) has 'built-in

apportionment.'" *Id*. "Built-in" apportionment exists because a license rate already "consider[s] the benefit from the patented technology over other technology and account[s] for that." *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys*., LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019). Therefore, where a license is used "as [the] starting point, [the] analysis could reasonably be found to incorporate the required apportionment." *Id. see also Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc*., 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("Because the parties' discussions centered on a license rate for the '069 patent, this starting point … already built in apportionment"). This built-in apportionment applies where the license is "sufficiently comparable." *Vectura*, 981 F.3d at 1040.

Defendants cannot now dispute that the 2007 offer and 2021 Siffron license are sufficiently comparable to the 2014/15 hypothetical negotiation, as they took the exact opposite position throughout this case. Defendants' own damages expert expressly opined that both the 2007 offer and Siffron license are comparable. *E.g*. Dkt. 531 Ex. 2 (Trexler Reb. Rpt.) at ¶ 427 ("the best indicator of the value Gamon placed on the technology covered by the Asserted Patents is the 2007 Gamon License Offer"), ¶ 225 ("the Siffron agreement is for gravity feed racks with comparable technology, economic benefits, and uses in the field").

Ms. Trexler testified to these opinions at trial, expressly referring to the 2007 offer as the "best starting point" for damages and using it as the basis for her own analysis:

> Q. And how was this opening offer relevant to your overall analysis? A. This is probably the ***best starting point*** I can have as a damages expert because it tells me what the president of Gamon and the inventor on the patent, what he -- what his opening offer was to Campbell's. That's what he put out there in 2007 for the technology that is in the racks. It's very rare that I would have an actual offer for the product that we're talking about. Tr. 909:7-15.

*See also* Tr. pp. 928-929 (Trexler conclusion of 4-6% rate based on adjustment of 2007 offer).

Ms. Trexler also testified to comparability of the Siffron license:

> Q. Okay. And like the Gamon 2007 opening offer, did you look at comparability? A. I did, yes. Q. And what are the similarities? A. So the similarities are that these are both gravity feed displays targeted toward the center store. They have that first-in, first-out dispensing. So the older product comes out first. You don't end up with expired product. Their product return capabilities improved ability to locate the product and then the stops that you've heard about. And I did have discussions with Mr. May, who did the technical analysis. But then I also have what you see that's highlighted here on the screen. Gamon themselves was drawing comparison between these products. Tr. 922:22-922:10.

Defendants likewise defended the comparability of the Siffron license in their *Daubert* brief and successfully persuaded the Court to admit it at trial. *See* Dkt. 553 p. 13-14; Dkt. 596 p. 28-29.

In short, Defendants affirmatively argued both before and during trial that the 2007 license offer and Siffron license were comparable, and had their own expert (Ms. Trexler) present them as the basis for her damages calculation. The jury was entitled to adopt Defendants' own position that the license and offer were comparable, then appropriately apply those licenses in light of the cross-examination and other witness testimony, including from Mr. Johanson, and on the record evidence of the extensive benefits to Defendants from their infringement.

Further, even leaving aside Defendants' clear waiver by affirmatively arguing that the 2007 license and Siffron agreement *were* the appropriate basis for a damages calculation, the fact that neither agreement is identical to the circumstances of the hypothetical negotiation does not render them insufficient to support a verdict. The Federal Circuit holds that:

> Prior licenses ... are almost never perfectly analogous to the infringement action … testimony relying on licenses must account for … distinguishing facts … the fact that a license is not perfectly analogous generally goes to the weight of the evidence not its admissibility.

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).

Notably, in *Vectura*, the Federal Circuit found built-in apportionment in nearly the same circumstances as here – where Defendants' own damages expert relied on a license and testified it was "a very close comparable." 981 F.3d at 1040. As another example, contrary to Defendants'

argument that a license offer has no built-in apportionment, in *Commonwealth Scientific* built-in apportionment was found based on "brief discussions" between the parties over "taking a license to the '069 patent." 809 F.3d at 1303. So too here, the 2007 offer concerned the Gamon patent family at issue in this case. Likewise, there is no requirement that the license include the asserted patent to have built-in apportionment. The agreement in *Elbit Systems* was for a patent other than the asserted patent in that case. 927 F.3d at 1300.

**5. The Jury Could Apportion Based on the Next-Best Alternative**

The Federal Circuit allows apportionment based on the value of a patented invention compared to the next-best alternative. *See Apple Inc.*, 757 F.3d at 1315 (finding proper apportionment where expert "estimated the value of the benefit provided by the infringed features by a comparing the accused product to non-infringing alternatives"), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). This approach provided an additional, fully independent basis to support the verdict.

Here, Defendants attempted and failed to develop an alternative rack. (Bray Tr., *supra*). As such, their only alternative to infringement was traditional shelving. The jury had extensive evidence of the value of infringing Racks over traditional shelving, including significant sales lift: *e.g.* a 19% sales lift in 2014 (PTX-109, Ex. 7 at 12) and $98 million in additional sales in 2006 (Trexler Tr. 1061:12-19, JTX-52, Ex. 8 at 9) (fully detailed *infra*, GP 6,8,10,11). It also resulted in significant cost savings to grocers over use of traditional shelving. Johanson Tr. 345:4-11 ("The IQ Maximizer gets rid of 100 percent of that labor because it's self-facing and everything is always looking clean."); Hatch Tr. 530:16-20 ("labor savings due to elimination of shelf conditioning"). *See also* PTX-94, Ex. 9 at 65 ($37 million estimated total annual value of racks at Kroger).

The financial difference between infringing and the next-best alternative can itself establish the reasonable royalty: "[r]eliance upon estimated cost savings from use of the infringing product

is a well settled method of determining a reasonable royalty." *Powell v. Home Depot, U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011); *see also TC Tech. LLC v. Sprint Corp.*, 2019 WL 2515779, at *3–4 (D. Del. June 18, 2019) (Andrews, J.) ("damages may be based on cost savings from a defendant's infringement without an independent analysis of the claimed invention's 'footprint in the market place'"). In *Slimfold Mfg. Co. v. Kinkead Indus., Inc*, the patentee provided evidence that the "pivot rod assemblies covered by the Ford patent were cheaper to produce and install," resulting in cost savings attributable to infringement. 932 F.2d 1453, 1456 (Fed. Cir. 1991). The Federal Circuit upheld the damages award which "awarded all profits that Kinkead realized in the form of manufacturing cost savings." *Id.* As such, the financial difference itself is an apportioned reasonable royalty, without reduction. The jury could have reasonably determined an apportioned royalty based on this sales lift and cost savings evidence.

#### 6. Gamon Also Addressed Every *Georgia-Pacific* Factor

The Federal Circuit also holds that apportionment can be done in conjunction with the *Georgia-Pacific* analysis. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348–49 (Fed. Cir. 2018) ("[w]e hold that such apportionment can be done in this case through a thorough and reliable analysis to apportion the royalty rate. We have recognized that one possible way to do this is through a proper analysis of the *Georgia–Pacific factors*."). As shown below, Gamon introduced evidence bearing on all the *Georgia-Pacific* factors.

##### a. GP 10, 11 – Benefits and Value of Use to Infringer.

The jury had significant evidence regarding the benefits and value of use of the invention. First, in 2020 use of Racks resulted in an incremental sales lift of 8.3% and incremental dollars per year per store of $7,869. (PTX-245, Dkt. 716-14 at 5, 6). That translates to $70 million in additional sales per year, based on 10,000 stores using Racks. (Cummins Tr. 610:16-23, Ceritelli Depo. (Dkt. 691-1, 130:4-19)). The jury had droves of additional sales lift data. For example:

- 2010: 8.1 % sales lift and 40% more shoppers buy soup in stores that have racks. (PTX-112, Dkt. 716-13 at 7, 9; Cummins Tr. 576:9-15, 577:7-15).
- 2014, 2015, 2016: sales lift of 19%, 40%, and 10%, 17% respectively (PTX-109 at 12, PTX-108, Ex. 10 at 4, JTX-54, Ex. 11).
- 2020: 11.9% sales lift at Meijer and added value of $23,983 per year per store (PTX-245 at 6, Cummins Tr. 608:23-609:8).
- Testimony that racks were used in a minimum of 10,000 stores. (Cerritelli, *supra*). *See also* Trexler Tr. 938:25-939:5 (installed in 19,000 stores at time of hypothetical negotiation).

**b. GP 1, 2, 12 – Licensing Factors**

Evidence on the 2007 offer and 2021 Siffron Agreement was presented as discussed above.

**c. GP 3, 7 – Scope & Duration of the License**

The Court instructed the jury that the damages period in this case is from Sept. 9, 2014 to June 30, 2023 (9 years). (Jury Instructions, Tr. 1391:13-21; Dkt. 696 p. 32).

**d. GP 4, 5 – Plaintiff's Licensing Policy; Party Relationship**

Mr. Johanson testified that in 2014/15, Gamon would not have been inclined to license its patents, and that the parties were (and are) competitors, both of which are factors that the jury could find exerted upward pressure on the proper royalty:

> In 2015 [my father] was alive, he could have completed that work. And it was always his interest to not license. It was his interest and our interest to manufacture. That's what Gamon did, is we manufactured. Tr. p. 403:18-21.
>
> Trinity's actions prevented us from selling our IQ Maximizer. They used our design. There is no way we would license something with them. Tr. p. 407:25-408:53.

**e. GP 6, 8 – Effect of Patented Invention On Sale of Other Products, Commercial Success, Profitability**

The evidence was clear that "Maximizer has been a driver of total soup growth" for Campbell's and the grocers (JTX-52 at 9). In addition to the sales lift evidence (Factors 10, 11 *supra*), Ms. Trexler testified that in 2006, Campbell's attributed $98.9 million/year in soup sales

to use of infringing Racks. Tr. 1061:12-19 ("Yes. If I do the math, that would be 98.9 million").

Further, Ms. Cummins testified that Campbell's recognized that use of the racks caused consumers to spend more on more expensive products:

> Q. Campbell's own executives talking internally concluded that these patented racks are driving consumers to actually spend more money on each product. They say higher priced non-icon items, correct? A. That's what it says. Tr. 579:4-579:8; PTX-112 at 11-12.

**f. GP 9, 13 – Advantages Over Prior Art, Apportionment**

Gamon addressed apportionment at trial in detail. Defendants focus on the closing argument, but closing is not evidence. Defendants simply ignore the extensive apportionment evidence in the trial record discussed above, and fail to engage with any of it in their motion. In any event, Defendants are wrong about the closing as well. Gamon argued apportionment in closing beyond declaring that "apportionment has already been done" – Defendants exclude immediately preceding argument specifically addressing their failure to add anything to Gamon's design, and lack of patents on any of their own innovations (Tr. 1460:13-1461:3, JTX-45, Ex. 12, Riley Tr. 708:9-12, 834:21-25). Defendants also omit extensive discussion of the license and offer that Defendants' own expert represented was comparable and presented as the proper basis for calculating damages without conducting further apportionment. (Tr. 1418:15-1420:12). Indeed, Gamon further addressed apportionment in its rebuttal closing, explaining Defendants had not added any unpatented features or innovations to the infringing design, but instead copied Gamon's design. Tr. 1460:13-1461:3; *see also id*. 1463:2-1464:11 (discussing 2007 license offer).

Further, even if Defendants' argument were credited that the large door and billboard effect is not due to the claims, the jury was presented with evidence to apportion out its value. For example, the 2003 Gamon-Campbell agreement included separate pricing for door cards (PTX 215, Ex. 13 Sch.B, $21.95 per store); and the 2008 Trinity-Campbell agreement stated that "[i]n

no event will Campbell be responsible for … card costs." (JTX-7, Ex. 14 Sch.B). The jury could have reasonably concluded that the door card value was not included in the rack price and did not need to be apportioned out of that price, or could have used this metric to value and deduct door cards.

Alternatively, the jury could have relied on the licensing evidence discussed above which has built-in apportionment. Or it could have concluded that any alleged unpatented, additional advertising had no value separate from the patented racks that needed to be apportioned out, based on the presented evidence that Campbell spent significantly more than $100M on advertising in 2006 yet that advertising only yielded about $98.9M in revenue – meaning that advertising was value-negative prior to the racks (Tr. 1061:10-19, 1064:19-1065:4, JTX-52 at 9).

### 7. There Is No Requirement that Apportionment Can Only Be Done By A Damages Expert or that A Precise Number is Required

Defendants repeatedly suggest that the jury could not have apportioned or determined damages without damages expert testimony from Gamon. This is wrong both legally and factually.

#### a. The Court Ruled Multiple Times That Under Federal Circuit Law, Damages Can Be Presented Without an Expert

Before trial, the Court rejected Defendants' argument that the exclusion of Gamon's damages expert meant Gamon could not obtain damages:

> Defendants and I have all agreed that Gamon can still offer proof of damages through fact witnesses in the wake of Mr. Weinstein's exclusion. 10/7/25 PTC Tr., Ex. 15 at 18:10-12.
>
> Gamon remains free to offer the facts that feature in Weinstein's report through other witnesses (subject, of course, to the rules of evidence and the Court's evidentiary rulings). Dkt. 631 p. 11.
>
> It's overly simplistic to say that because I previously said that the jury should not hear the large number that Mr. Weinstein calculated, the jury should not be permitted to hear any large number at trial. In short, to the extent that defendants move for Gamon to be barred from presenting a soup-sales-based damages theory, the motion is denied. 10/7/25 PTC Tr. 14:11-18.

Defendants' position is also the opposite of their position before trial, when they acknowledged that Gamon could introduce damages evidence through fact witnesses:

> We haven't heard why Gamon can't introduce this evidence through fact witnesses and then use it on cross-examination of defendants, Ms. Trexler, and then argue in closing. That is the exact type of analysis that I think was envisioned by Dow Chemical, where you can certainly try to put in a damages case without an expert. 9/12 PTC Tr., Ex. 16 at 114:9-15.

Further, the Court gave a detailed jury instruction on apportionment, including:

> If you find that any damages are owed to plaintiff, the amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors, such as marketing or advertising, or the patent holder's size or market position. A royalty compensating the patent holder for damages must reflect only the value attributable to the infringing features of the product and no more. The process of separating the value of the allegedly infringing features from the value of all the other features is called apportionment. … Plaintiff must give evidence tending to separate or apportion damages between the patented features and the unpatented features, and such evidence must be reliable and tangible and not conjecture or speculation. Jury Instructions, Tr. 1394:14-24, 1395:9-12; Dkt. 696 p. 36.

The jury is presumed to have followed the jury instructions. *Magnuson v. Trulity Glass and Aluminum Sols. LLC*, 2025 WL 2556258, at *2 (7th Cir. 2025); *Omega Patents LLC v. CalAmp Corp.*, 13 F.4th 1361, 1372 (Fed. Cir. 2021).

**b. Plaintiff Was Not Required To Present the Jury With Numerical Exactitude as to Apportionment**

Plaintiffs were not required to provide exact numerical certainty on apportionment:

> [W]e have never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty.

*VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

The jury had more than sufficient evidence to apportion, as discussed in detail *supra*. Defendants' cases finding failure to apportion are inapposite. For example, in *Exmark Mfg Co. Inc.,* 879 F.3d at 1350, plaintiffs' expert ignored patents covering aspects of accused motors

unrelated to the asserted patent. Here, the testimony was that there are no patents on other aspects of the Racks. Riley Tr. 708:9-12 ("Q. And in terms of innovation, the infringing system, you have no patents and filed no patent applications on it, correct? A. Correct."). And in *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018), Plaintiff presented expert testimony that failed to apportion at all. Here, the jury was presented significant evidence to apportion and was properly instructed on how to perform that apportionment by the Court.

*Rex Med., L.P. v. Intuitive Surgical, Inc.* is readily distinguishable. There, patentee's damages evidence consisted solely of a license to 10 patents that included the asserted patents and eight unasserted patents. The patentee offered no evidence at all to apportion out the value of the asserted patents from the unasserted patents. No. 2024-1072, 2025 WL 2799030, at *7-8 (Fed. Cir. Oct. 2, 2025). There was no evidence comparing to a next-best alternative, or to licenses and offers that the Defendant admitted were comparable. Nor was there any technical analysis of the contribution of the claims to the overall benefits. Nor was there any *Trans-World* analysis. The Court specifically found that the only evidence was the unallocated license, and no "record evidence that would allow reasonable apportionment." *Id.* at *8. In contrast here, there was extensive evidence of apportionment and Gamon did not rely on a portfolio license agreement.

Notably, while Defendants critique Plaintiffs for presenting apportionment evidence through a technical expert and lay witness, Ms. Trexler confirmed that damages analysis may rely on technical experts, and that she in fact did so: "I did have discussions with Mr. May, who did the technical analysis" (Tr. 922:7-8).

### B. Defendants' Other Damages Arguments Are Unsupported and Incorrect

#### 1. The Jury Had More Than Sufficient Information With Which To Determine a Reasonable Royalty

Defendants suggest that Gamon provided no evidence from which the jury could select an

appropriate royalty base or royalty rate. (Br. at 18). There is no requirement that a royalty base be used at all, or that damages be based on a calculation of a base times a rate. For example, a royalty may be calculated as a lump sum, cost savings, or other value not specifically using a base multiplied by a rate. *See, e.g.*, *Virnetx, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("A reasonable royalty may be a lump-sum payment not calculated on a per unit basis."); *Hanson v. Alpine Valley Ski Area, Inc*., 718 F.2d 1075, 1080–81 (Fed.Cir.1983) ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty"). Further, even in methodologies that use a royalty base, a proper base may be not only revenue or profit, but it could also be the number of units made or sold, or the number of infringing uses (i.e. a per-use or per-unit royalty). *See Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1339 (Fed. Cir. 2009) ("awarding a reasonable royalty based on either sale price or number of units sold can be economically justified").

Here, record evidence supported a lump-sum amount, including Gamon's 2007 license offer (Johanson Tr. 386:20-387:7) which Ms. Trexler testified was comparable (*supra*). It also supported a next-best alternative calculation, as discussed above.

In any event, Gamon presented more than sufficient evidence to prove a royalty base, including evidence of unit sales of the infringing racks, and the corresponding revenues, pricing, and profits both on an overall and per unit basis. *See* Trexler Tr. 906:23-907:16, 924:23-2, PTX-77 at 1 (Gamon and Trinity sales and profit on racks), Tr. 1045:10-14, PTX-280, DTX-118 (Trinity Units Shipped and Revenue).

Defendants also argue that Gamon provided no evidence to determine a royalty rate. (Brf. at 18). This is simply a repeat of their apportionment argument and fails for the same reasons. The same evidence discussed above was also relevant to and supports the royalty amount. There is no

requirement the patentee proffer a single specific royalty rate: "we are aware of no precedent that requires [a patentee] to provide a single proposed royalty rate." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983 (Fed. Cir. 2021).

### 2. The Jury's Damages Amount Need Not Have Been Explicitly Proposed By Either Party

Contrary to Defendants' assertions, the fact that the jury awarded a damages amount that neither side proposed or explicitly presented at trial does not undermine the validity of the verdict or render it "speculative." Juries routinely review significant volumes of information bearing on damages and reach a conclusion that they believe is most appropriate in light of all of the evidence, and may in that analysis find an amount not proposed by either side:

> We have not held "that a jury may only arrive at a royalty specifically articulated by the parties during trial," but "[r]ather, a jury's choice simply must be within the range encompassed by the record as a whole.

*Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *Bayer Healthcare LLC*, 989 F.3d at 983 (a jury is "entitled to choose a damages award within the amounts advocated by the opposing parties."); *Fuji Photo Film Co.*, 394 F.3d at 1378 ("[T]he jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate."). *See also Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 362 (3d Cir. 1981) (basing reasonable royalty rate on evidence of record not proposed by patentee).

Precision is neither expected not required – rather, "a reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Lucent Techs.*, 580 F.3d at 1336. And, "estimating a reasonable royalty is not an exact science." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir.2015).

## IV. CONCLUSION

For the reasons set forth herein, the Court should deny Defendants' motion for JMOL.

Dated: December 17, 2025

Respectfully Submitted,

**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
*/s/ Kal K. Shah*

Kal K. Shah
Mircea A. Tipescu
Cristina Q. Almendarez
Louis Constantinou
BENESCH FRIEDLANDER
COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Tel: (312) 212-4949
kshah@beneschlaw.com
mtipescu@beneschlaw.com
calmendarez@beneschlaw.com
lconstantinou@beneschlaw.com

Timothy P. Heaton (admitted *pro hac vice*)
BENESCH FRIEDLANDER
COPLAN & ARONOFF LLP
1155 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: 646.593.7050
theaton@beneschlaw.com

Jason G. Sheasby (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277-1010
jsheasby@irell.com

Lisa S. Glasser (admitted *pro hac vice*)
Stephen M. Payne (admitted *pro hac vice*)
IRELL & MANELLA LLP
840 Newport Center Dr., Suite 400
Newport Beach, CA 92660
lglasser@irell.com
spayne@irell.com

*Attorneys for Gamon Plus, Inc. and Gamon International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2025, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, and service has been effectuated to all counsel of record via email.

*/s/ Kal K. Shah*
Kal K. Shah
*Attorney for Plaintiffs*