**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMON PLUS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE CAMPBELL'S COMPANY F/K/A CAMPBELL SOUP COMPANY, et al.,<br><br>Defendants. | No. 15 CV 8940<br><br>Judge Georgia N. Alexakis |

**MEMORANDUM OPINION AND ORDER**

Following a five-day jury trial in October 2025, a jury awarded $17,398.564.27 to plaintiffs Gamon Plus, Inc. and Gamon International, Inc. (collectively, "Gamon") on its claims of patent infringement. By agreement of the parties, the jury was instructed that the defendants—the Campbell's Company, The Kroger Company, Meijer, Inc., and Trinity Manufacturing, LLC—infringed all asserted claims of U.S. Patent No. 8,827,111 (the '111 Patent) and U.S. Patent No. 9,144,326 (the '326 Patent) by using the "IQ Maximizer" gravity-feed racks ("Racks") to display and sell soup cans at grocery stores throughout the nation. The jury then rejected defendants' invalidity defenses before reaching its damages determination.

Defendants now seek to set aside the jury's damages award in a renewed motion for judgment as a matter of law brought under Federal Rule of Civil Procedure 50(b). In defendants' view, a reasonable jury could have awarded only zero or nominal damages because Gamon failed (1) to provide any evidence of apportionment and (2)

to prove non-speculative damages. For the following reasons, the Court denies defendants' motion. [713].

## I. Legal Standards

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is appropriate if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant. Fed. R. Civ. P. 50(a)(1). To determine whether the jury verdict had a legally sufficient evidentiary basis, the court must "construe[] the evidence strictly in favor of the party who prevailed before the jury," *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012), and "draw[ ] all reasonable inferences in the light most favorable to [the non-moving party]," *Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1036 (7th Cir. 2000). The court also "disregard[s] all evidence favorable to the moving party that the jury [was] not required to believe." *Passananti*, 689 F.3d at 659 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

In reviewing the record, the Court can neither "make credibility determinations" nor "weigh the evidence." *Id*. Rather, a court must simply "determine whether a reasonable jury could have found in favor of" the prevailing party. *Harvey v. Off. of Banks & Real Est.*, 377 F.3d 698, 707 (7th Cir. 2004). Furthermore, "[i]nfringement is a question of fact." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010). "[T]he task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).

At bottom: "Overturning a jury verdict is a hard row to hoe." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003) (citation omitted).

## II. Analysis

### A. Principles of Apportionment

"When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). No matter what the method of calculation, "a patentee must take care to seek only those damages attributable to the infringing features." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("A reasonable royalty does not overreach and encompass components not covered by the patent." (internal quotation marks omitted)); *Finjan*, 879 F.3d at 1309 ("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."). This process—separating the value attributable to the infringing features from those attributable to the non-infringing features—is known as an "apportionment analysis."

"Undertaking an apportionment analysis where reasonable royalties are sought generally requires a determination of the royalty base to which the royalty rate will be applied." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). The plaintiff must give reliable, tangible evidence separating damages between the patented features and the unpatented features. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (cleaned up). "[T]he ultimate combination of royalty base and royalty rate must

reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] … by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Ericsson*, 773 F.3d at 1226. "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* "[D]amages may not be determined by mere speculation or guess." *See Rex Medical, L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1300 (Fed. Cir. 2025) (cleaned up). At the same time, the Federal Circuit has "never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty." *Virnetx, Inc.*, 767 F.3d at 1328.

"[W]hen a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *See Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). "That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.'" *Id.* "Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id.* at 1041; *see also Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967

F.3d 1353, 1377 (Fed. Cir. 2020) (no adjustment of royalty rate required when comparable license agreement could reasonably be found to incorporate the required apportionment). For built-in apportionment to apply, the license must be "sufficiently comparable," such that the "principles of apportionment were effectively baked into" the comparable license. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021) (quoting *Vectura Ltd.*, 981 F.3d at 1041). The plaintiff has the burden of proving that the licenses were sufficiently comparable. *Id.*

"Such a model begins with rates from comparable licenses and then accounts for differences in the technologies and economic circumstances of the contracting parties." *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (cleaned up). Comparable license theories of damages must account for "distinguishing facts when invoking them to value the patented invention." *Ericsson, Inc.*, 773 F.3d at 1227. The record must provide evidence from which the jury could find or infer a damages number for a license to the patented product, or any other evidence that would allow reasonable apportionment. *Rex Medical, L.P.*, 156 F.4th at 1300; *see also Ericsson, Inc.*, 773 F.3d at 1227–28 (recognizing that, even though "[p]rior licenses ... are almost never perfectly analogous to the infringement action," if accompanied by testimony accounting for the distinguishing facts, prior licenses may help the jury decide an appropriate royalty award).

At trial, the Court instructed the jury on apportionment as follows:

> If you find that any damages are owed to Plaintiff, the amount you find as damages must be based on the value attributable to the patented

> invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or the patent holder's size or market position. A royalty compensating the patent holder for damages must reflect only the value attributable to the infringing features of the product, and no more. The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.
>
> When damages must be apportioned, the amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or the patent holder's size or market position.
>
> Plaintiff bears the burden of proving the incremental value of the patented features. This requires Plaintiff to show what portion of the accused product's value is attributable to the patented technology versus unpatented components. Plaintiff must give evidence tending to separate or apportion damages between the patented features and the unpatented features, and such evidence must be reliable and tangible, and not conjecture or speculation. If you decide Plaintiff is entitled to a reasonable royalty, you must account for the relative value of the new and inventive elements of Plaintiff's patented racks in comparison to the unpatented elements. In other words, you may reward Plaintiff only for its innovation: the incremental benefit bestowed by only the new elements of a patent claim, taken as a whole.
>
> On the other hand, if demand for the entire accused product depends only on the claimed features, then apportionment is not necessary even though the accused product includes non-patented features.

[696] at 35.[1]

---

[1] Defendants point to the Court's statement at a pretrial proceeding that it would be insufficient to instruct the jury on the apportionment principle simply by pointing to one of the factors in the *Georgia-Pacific* analysis. [714] at 2; *see generally Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). As the Court explained during that pretrial proceeding, in connection with the *Georgia-Pacific* factors, jurors would be instructed that they "*may* consider the following factors, in addition to any others that are shown by the evidence" when considering a hypothetical negotiation and the resulting reasonable royalty. [696] at 33 (emphasis added); [716-1] at 55. The Court continued: "[T]hat becomes problematic if they choose not to put any weight on … the factor that speaks to the apportionment principle, and so that's why I think we need a separate instruction on the apportionment principle." [716-1] at 55.

Other portions of the jury instructions also addressed apportionment and instructed the jury not to rely on conjecture. *See id.* at 36 (in instructing the jury on reasonable royalty awards, the Court explained that the jury "must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone"); *id.* at 34 (instructing that in determining a reasonable royalty, the jury could consider "[t]he portion of the profit on sales that is due to the patented invention, as opposed to other factors, such as unpatented elements or processes, features, or improvements developed by Defendants"); *id.* (instructing jurors that "[p]laintiff is required to prove the amount of a reasonable royalty to a reasonable probability and may not recover amounts that are speculative, only possible, or based on guesswork" but that "mathematical certainty is not required").

**B. Unpatented Features**

In seeking to set aside the jury's verdict, defendants argue that the jury's apportionment analysis erroneously included the Racks' door design and the door cards that the Racks' doors accommodated. According to defendants, because the Asserted Claims do not recite the doors' curvature or size (height or width), Gamon should have apportioned out those features. [714] at 7–8. Instead, the jury heard evidence that the door cards themselves, which were unpatented and designed by defendant Campbell's, helped increase soup sales and decrease labor costs. *Id.* at 8–9. The jury also heard evidence that the doors' size and curvature, combined with the

door cards, created a "billboard effect" that is not part of the Asserted Claims. *Id.* at 9–10.

Claim 17 of the '111 Patent describes "a door supported for movement between a substantially vertical closed position wherein said door covers the product loading openings of both of the chutes … said door in said closed position having a forwardly disposed face capable of holding a product label or advertising." JTX 1 at 37. Claim 2 of the '326 Patent likewise describes a door that "covers the product loading opening … having a forwardly disposed face capable of holding a product label or advertising," while Claim 23 describes a door with "vertical height at least twice the diameter of the products." JTX 2 at 36, 38.

As Gamon points out, these claims expressly cover the door, its large size as covering the loading openings of two chutes, and its ability to hold a product label or advertising. [724] at 3–4. More specifically, Gamon's technical expert, Paul Hatch, testified that the "door that's described by the claims" is "certainly relatively tall and wide" because it "is at least twice as large as the product" and "cover[s] the two chutes." Tr. 556; *see also id.* at 514 (testifying that the claim includes "a large door," "covering two of these loading openings where we load the products … it's describing exactly that the door is larger than two of the products"). One of the Racks' inventors, Travis Johanson, explicitly drew the connection between the Racks' doors, their large size, and the resulting "billboard effect." *Id.* at 373. Johanson testified that the design's two chutes meant "you get a double size door … more than two times the size of the can's surface. So you end up creating a large advertisement, a large billboard

for Campbell's Soup and advertising which product that you're looking for." *Id.*; *see also id.* at 370 (Johanson: "We had to go a dual chute design. And the dual chute even allowed us to have that oversized billboard."); *id.* at 412 (Johanson: "[Shoppers] would see a large billboard that was created by our two-chute design to allow them to find the soup, yes."). Hatch similarly testified that "[t]he particular [door] design .... is in the claims," and it is that design which provides the Racks' "unique benefit." Tr. 539. Hatch continued: "[I]t is large and it enables a graphic to be placed upon it." *Id.*

It is true that the claims do not describe the doors' curvature, or the appearance of the door cards themselves. But the claims comprehend doors facing forward; large enough to cover two chutes; at least twice as high as the can's diameter; capable of holding product advertising. JTX 1 at 37; JTX 2 at 36, 38. From these descriptions—coupled with Johanson and Hatch's testimony describing the cumulative operation of these claimed features—the jury could fairly imagine a "billboard effect," with or without curvature, attributable to the patented features. Moreover, such a conclusion by the jury would be consistent with trial testimony that Gamon's design, viewed collectively, was unique, *see* Tr. 717 ("the combination of everything" was "unique"); and that defendants added no unpatented features to it, *see* Tr. 708.

The Court is thus unpersuaded by the defendants' argument that the trial record provides an insufficient evidentiary basis for the jury's damages award and underlying apportionment analysis.

### C. Comparable Agreement

Gamon also points out that the jury heard evidence of a license offer and a license agreement, which, in Gamon's view, "provided a separate and independent basis for apportionment." [724] at 8. The Court agrees.

The jury heard evidence that in 2007, Gamon offered to license the patents to defendant Campbell's for a lump sum payment of $20 to $24 million. Tr. 385–87; [724] at 8. Although this 2007 offer was only an offer, a reasonable jury still could infer that Gamon's starting value for its technology was somewhere in that range. Indeed, defendants' own damages expert, Dana Trexler, testified that this early offer was the "best starting point" for negotiations. Tr. 909. Moreover, Trexler explained how she used this "starting point" to calculate a royalty rate of 4% to 6% in the hypothetical negotiation, describing for the jury the various factors that led her to make a downward adjustment of Gamon's opening offer. *See id.* at 910, 913–20, 928–29. *Cf. Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) ("[W]hen [the damages expert] used the Gilat Agreement as his starting point, his analysis could reasonably be found to incorporate the required apportionment.").

Critically, the jury was also presented with evidence concerning a 2021 licensing agreement between Gamon and third-party Siffron to license gravity feed racks used to sell beverages, *see* [724] at 8 (collecting evidence on this point), and heard that the value of that licensing agreement was approximately $24 million, *see* Tr. 946. The 2021 Siffron license thus was in step with the 2007 offer, and both of

these other data points, as Gamon observes, are consistent with the jury award of $17,398.564.27. [724] at 9.

To be sure, and as noted earlier, for built-in apportionment to apply, the benchmark license or negotiation must be "sufficiently comparable." *Omega Patents*, 13 F.4th at 1377 (quoting *Vectura Ltd.*, 981 F.3d at 1041). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *See Bio-Rad*, 967 F.3d at 1372–73. That is a question for the jury to decide. *Id.* at 1374–75.

At trial, the parties presented ample evidence which allowed the jury to make this comparability assessment. Inventor Johanson testified that by 2014 and 2015, the '111 and '326 patents had issued and that sales had grown since 2007 through use of the Racks. [724] at 9; *see also* Tr. 382, 387–88. Johanson also testified that, come 2021, circumstances had changed adversely for Gamon with the death of Terry Johnson, Johanson's father and Gamon's founder, and that, as a result, Siffron needed "to do additional work" to complete the rack for beverage-sale purposes. *See* [724] at 9; Tr. 403 (Johanson: "My father was not alive to complete that work. In 2015, he was alive, he could have completed that work. And it was always his interest to not license. It was his interest and our interest to manufacture."). The jury heard testimony as well from Trexler, defendants' damages expert, about the comparability of the Siffron license to a hypothetical negotiation concerning the Racks. *See* Tr. 920–23 (testifying that, as part of her analysis, Trexler considered similarities and

differences in technical capabilities, general terms of agreement, the licensees, the target users, and the intended distribution channels, among other factors).

For these reasons, the jury was presented with evidence of a sufficiently comparable license or negotiation that permitted it to calculate a damages award based on the principle of built-in apportionment.

### D. The *Georgia-Pacific* Factors

Apportionment also can be accomplished through an analysis of the *Georgia–Pacific* factors. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348–49 (Fed. Cir. 2018) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116 (S.D.N.Y. 1970)). The "standard" *Georgia-Pacific* reasonable royalty analysis "takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Id.* at 1349 (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1344, 1338 (Fed. Cir. 2015)). At trial, the jury heard evidence bearing on all the *Georgia-Pacific* factors, thus providing an additional basis to decline defendants' request that the jury's damages award be wholly set aside. In particular:

#### 1. *Georgia-Pacific* Factors 10 and 11

*Georgia-Pacific* Factor 10 considers "the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention," and *Georgia-Pacific* Factor 11 considers "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia-Pacific*, 318 F. Supp. at 1120. As summarized by Gamon in its opposition to defendants' motion, the jury was

presented with substantial evidence bearing on these factors—namely, evidence of increased sales, increased number of shoppers buying soups, and the number of stores in which the Racks were used. *See* [724] at 13–14 (collecting relevant portions of trial record).

### 2. ***Georgia-Pacific*** Factors 1, 2, and 12

*Georgia-Pacific* Factor 1 considers "the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"; *Georgia-Pacific* Factor 2 looks to "the rates paid by the licensee for the use of other patents comparable to the patent in suit"; and *Georgia-Pacific* Factor 12 pertains to "the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Georgia-Pacific*, 318 F. Supp. at 1120. The Court agrees with Gamon that the evidence presented to the jury regarding the 2007 offer and the 2021 Siffron Agreement, summarized above, bears on all three of these factors. [724] at 14.

### 3. ***Georgia-Pacific*** Factors 3 and 7

*Georgia-Pacific* Factor 3 covers "the nature and scope of the license" and *Georgia-Pacific* Factor 7 covers "the duration of the patent and the term of the license." *Georgia-Pacific*, 318 F. Supp. at 1120. The jury heard testimony concerning the nature and scope of the posited license, *see, e.g.*, Tr. 354, 384, 913–16, and was instructed on the length of the damages period, [696] at 32.

### 4. ***Georgia-Pacific*** Factors 4 and 5

*Georgia-Pacific* Factor 4 concerns "the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use

the invention or by granting licenses under special conditions designed to preserve that monopoly," and *Georgia-Pacific* Factor 5 concerns "the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter." *Georgia-Pacific*, 318 F. Supp. at 1120. Through Johanson, the jury heard testimony bearing on both these factors, including Johnson's interest in manufacturing over licensing and that Gamon and defendant Trinity were competitors in the same line of business. Tr. 403–04, 407–08.

**5. *Georgia-Pacific* Factors 6 and 8**

*Georgia-Pacific* Factor 6 pertains to "the effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia–Pacific*, 318 F. Supp. at 1120. Factor 8 relates to "the established profitability of the product made under the patent; its commercial success; and its current popularity." *Id.* With respect to these factors, the jury heard substantial evidence of the Racks' positive effect on soup sales as well as the purchase of higher-priced Campbell's products. [724] at 13–15; Tr. 578–79.

**6. *Georgia-Pacific* Factors 9 and 13**

*Georgia-Pacific* Factor 9 covers "the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results," and *Georgia-Pacific* Factor 13 concerns "the portion of the realizable profit that should be credited to the invention as distinguished from non-patented

elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific*, 318 F. Supp. at 1120.

With respect to both factors, in addition to its discussion above addressing defendants' arguments regarding non-patented features, *see supra* at 7–9, the Court also notes that the jury heard evidence regarding the Racks' technical advantages relative to previously available dispensers, such as the Eveready and Minute Maid dispensers, *see* [724] at 5–6 (highlighting relevant testimony from Johanson and Hatch); Tr. 1250–52; how defendants Campbell and Trinity both tried to develop an alternative dispenser to the Racks but proved unsuccessful, *see* [692-2] at 3; Tr. 708, 834; and how the Racks provided significant sales lift relative to traditional shelving, *see, e.g.*, [724] at 12 (summarizing trial evidence on this point).

Defendants argue that in their closing argument, Gamon "conspicuously omitted Factor 13 (which specifically addresses apportionment) and never explained how any record evidence could support it." [714] at 3. But closing arguments, of course, are not evidence. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017). Thus, even if defendants' characterization of Gamon's closing argument were true, any failure by Gamon to address apportionment before the jury is of no moment, so long as the jury's verdict is supported by the trial record and the jury was properly instructed on apportionment principles. Moreover, to the extent Gamon's closing argument bears on whether the jury's verdict has a legally sufficient evidentiary basis, the trial record reflects that in its closing argument, Gamon did address evidence bearing on the issue of apportionment, citing to portions of the trial

record discussed earlier in this opinion. *See, e.g.*, Tr. 1410–11, 1423, 1453, 1460–61, 1463 (discussing defendants' inability to design a successful alternative to the Racks); *id.* at 1420, 1463–64 (discussing the 2007 offer and 2021 Siffron agreement).

* * *

For all of the aforementioned reasons, the Court is unpersuaded by defendants' argument that Gamon failed to provide any evidence of apportionment and, as a result, a reasonable jury could have awarded Gamon only zero or nominal damages.

### E. Non-Speculative Evidence of Damages

Defendants separately argue that Gamon presented no reliable, non-speculative proof of a reasonable royalty because it offered no evidence from which the jury could select an appropriate royalty base or rate without impermissible conjecture. [714] at 17–20. Defendants' argument boils down to the following: Because Gamon did not put forward a damages expert to assist the jury in calculating damages, the jury must have resorted to speculation. As Gamon points out, this argument is essentially a rehash of one Campbell's made before trial: that Gamon could not present a damages case without an expert. The Court rejected that argument then, *see* [724] at 16 (collecting record citations), and for the same reasons previously articulated, it does so again now. Indeed, defendants' position post-trial contradicts the position defendants staked out before trial. *Id.* at 17.

Defendants' argument is flawed in another regard as well. Defendants assume that the jury calculated their damages award by selecting a royalty base and rate (and doing so based on impermissible speculation). [714] at 18–19. But as the Federal

Circuit has explained, there is no requirement that a royalty base be used at all. *See, e.g.*, *Virnetx*, 767 F.3d at 1326. The jury was instructed accordingly. *See* [696] at 36. And evidence in the record supported such an approach to a damages calculation, where the jury was presented with evidence concerning Gamon's 2007 license offer and the 2021 Siffron agreement, as well as evidence that permitted a comparability assessment and downward adjustments of the figures associated with the offer and agreement. *See supra* at 10–12.

Besides, as Gamon points out, evidence in the trial record provided a non-speculative basis for the jury to settle on a royalty base and royalty rate, *see* [724] at 19–20, including testimony from defendants' own damages expert. Simply because the jury did not award the damages amount that defendants proposed or that was otherwise expressly articulated at trial does not reduce the jury's work to speculation. *See Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 984 (Fed. Cir. 2021) ("A jury's damages award must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.") (cleaned up); *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) ("[A] jury's choice simply must be within the range encompassed by the record as a whole.").

## III. Conclusion

For the foregoing reasons, the Court denies defendants' renewed motion for judgment as a matter of law on damages under Federal Rule of Civil Procedure 50(b). [713].

ENTER:

Georgia N. Alexakis
United States District Judge

Date: September 17, 2026